G. S. McKENZIE, CHAIRMAN, C. C. CROZIER, E. W. GREENE, H. E. GREGORY, A. G. BUDGE, L. H. BIGELOW AND L. M. WHITEHOUSE, MEMBERS OF THE BOARD OF WATER SUPPLY, CITY AND COUNTY OF HONOLULU, *v.* JOHN H. WILSON, MAYOR OF THE CITY AND COUNTY OF HONOLULU, ET AL.

No. 1903.

Argued December 16, 1929.   Decided January 14, 1930.

Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a submission under sections 2371 to 2374, R. L. 1925, upon a statement of agreed facts of a controversy relating to the validity of Act 96, L. 1929. That Act creates a board to be known as the "Board of Water Supply of the City and County of Honolulu," to consist of seven members, of whom five are to be appointive and of whom two "shall always be the persons who for the time being shall be the legal incumbents of the offices of the superintendent of public works of the Territory and the chief engineer of the department of public works of the City and County of Honolulu." The duty of the board is "to manage, control and operate the water system and properties of the City and County of Honolulu, for the supplying of water to the public within the district of Honolulu; and to collect, receive, expend and account for all sums of money derived from the operation thereof and all other moneys provided for the use or benefit of said water system," as in the Act provided. The property transferred includes real estate and personalty and in-

cludes all lands, reservoirs, pipelines, pumps and other machinery which at the date of the Act were in the possession and control of the City and County of Honolulu for the purposes of a system of water supply for Honolulu and for the purposes of an electric power station maintained by the city and county in Nuuanu Valley. The Act reposes in the new board the power to make all necessary extensions, additions, improvements and betterments in connection with the water system. It vests in it "all of the powers and functions now provided to be exercised and performed by the board of supervisors of the City and County of Honolulu in relation to the Honolulu water works by Act 138, Session Laws 1913, as amended, and by the Honolulu sewer and water commission and/or by said board of supervisors by Act 150, Session Laws 1925, Act 40 of the Session Laws of 1927, and Act 222 of the Session Laws of 1927, and acts amendatory thereof," except as in the Act otherwise provided. With relation to the power of appointment of the members of the board, the provision is that "the first five appointive members of the board shall be appointed, and may be removed, by the governor in the manner provided by section 80 of the Organic Act," and that one of the members "shall be designated by the governor as chairman;" and that "thereafter the appointive members of the board shall be appointed by the mayor, with the approval of the board of supervisors of the City and County of Honolulu;" and that "upon the expiration of the term of office of the chairman or upon his retirement the mayor, with the approval of the board of supervisors * * * shall designate another member to fill the office of chairman." The members of the board are to serve without pay. Each member "must be at the time of his appointment an elector of the City and County of Honolulu and must have been such for at least five years next preceding his appointment."

Any member of the board other than the first five appointed by the governor "may be removed from office in the same manner as the mayor of the city and county." The term of office of the appointive members is to be five years "provided that upon the first appointments one of said members shall be appointed for a term ending June 30, 1931; one for a term ending June 30, 1932; one for a term ending June 30, 1933; one for a term ending June 30, 1934; and one for a term ending June 30, 1935." Officers and employees of the Territory or of the city and county "shall not be eligible for appointive membership on the board." The board is given power to appoint a manager and the manager is in turn given power "to appoint and discharge such other employees, subordinates and assistants as may be necessary for the proper conduct of the business of the board." All salaries, wages and other compensation of all persons employed by the board "shall be fixed by the manager with the approval of the board," the manager's compensation being fixed by the board.

The city and county attorney is to be the legal adviser of the board and is required to present and defend any and all actions and proceedings involving matters under its jurisdiction. The board, however, is given authority to employ another attorney as its legal adviser and representative in litigation. The Act further provides that "all moneys in the city and county treasury belonging to any fund of the water works system for said district of Honolulu upon the date this Act shall take effect, and all moneys thereafter collected belonging to any such fund * * * shall by the treasurer of the city and county be placed to the credit of the board;" and that "all outstanding obligations in connection with the operation of said water system shall be paid by the board out of said water works funds." The board is given power to contract "for

work, supplies, materials or equipment when the cost of these can be met from the revenues or reserves of the water works or from the proceeds of bonds authorized for such water works." It is also given power to "locate and determine the character and type of all construction and additions, extensions, increases, betterments and improvements to the water works, and shall determine the policy for such construction or the making of such additions, extensions, increases, betterments and improvements out of public funds under its jurisdiction." The board is required to "maintain proper accounts" of all its receipts and expenditures so as to show "the true and complete financial status and the results of management and operation," and costs of extension and maintenance. It is given power to "provide for the accumulation of a fund for the purpose of financial" (?) "major replacements, or extensions and additions, the average estimated annual increment to which, for a period of ten years, shall not exceed fifteen per cent of the gross revenue of the board in any fiscal year."

The Act further provides that "the treasurer of the city and county shall, when so directed by the board, sell such bonds as have or may hereafter be authorized for the acquisition, construction, replacement, extension or completion of such water works; provided that such sale shall otherwise be conducted in accordance with the procedure specified by the law for the sale of such bonds;" and that "the proceeds from said sales shall be kept by the city and county treasurer in a separate fund to be used only for the purposes for which such bonds were sold."

All receipts of the board "other than from the sale of bonds, shall be paid daily into the city and county treasury and maintained in a special fund." The board is authorized to make appropriations and allowances from said special fund for the following purposes: "(a) for

the payment of the operating and maintenance expenses of such water works; (b) for repairs, replacements, additions and extensions; (c) for accident reserve, pension charges and compensation insurance; (d) for payment of interest and sinking fund on all bonds heretofore or hereafter issued;" and "(e) for reserve fund under section 11 of this Act."

The moneys expended by the board are to be "disbursed by the city and county treasurer only upon warrants issued by the city and county auditor on vouchers signed by the chairman or acting chairman of the board."

The board is given power "to fix and adjust rates and charges for the furnishing of water and for water service such that the revenues derived therefrom shall be sufficient to make the water works self-supporting and to meet all expenditures included under items (a), (b), (c), (d) and (e)  *  *  *; and any other expenditures which may be occasioned, either directly or indirectly, in supplying water in the district of Honolulu;" and to collect and by proper means enforce the payment of all water rates and charges. There is a prohibition against the furnishing of water free of charge. The board is given power to sue and be sued in its own name; and is given other incidental powers which need not be here enumerated.

In due course after the passage of this Act the members of the newly created board were appointed by the governor and thereafter the board requested from the supervisors of Honolulu possession and control of all of the property intended by the Act to be vested in the board of water supply. The request was refused, a *modus vivendi* was arranged by the two sets of officers concerned and this submission was filed.

In the submission and in their briefs the mayor and the board of supervisors and the one taxpayer who joins

them as a defendant claimed that Act 96 violates the Constitution of the United States in that it constitutes and involves a deprivation of property without due process of law, a taking of property for public use without just compensation and an impairment of the obligation of contracts. These claims, however, were all in the clearest language abandoned at the oral argument. There is always a presumption, a strong presumption, that acts of the legislature are constitutional and courts do not seek grounds of unconstitutionality but devote their attention merely to those alleged causes of invalidity which are advanced and argued by persons and other entities entitled to raise the questions. We shall therefore confine ourselves to a consideration of those alleged causes of invalidity which are presented in the briefs and in oral argument and which have not been abandoned.

In addition to another subject to be later referred to, the reliance of the petitioners is upon the contention that Act 96 violates section 56 of the Organic Act of this Territory in that it provides for the appointment of the five appointive members of the new board by the governor instead of providing for their appointment by the authorities of the City and County of Honolulu and because it constitutes a violation of what is called the inherent right of the people of the City and County of Honolulu to manage their own affairs generally and the Honolulu water works in particular through officers who have either been elected by themselves alone or who have been appointed by those to whom they alone have delegated the power of appointment; or, perhaps with greater exactness, the contention is that, reading section 56 of the Organic Act in the light of and in conjunction with this alleged inherent unwritten right, Act 96 constitutes a violation of section 56.

Section 56 of the Organic Act reads as follows: "That

the legislature may create counties and town and city municipalities within the Territory of Hawaii and provide for the government thereof, and all officials thereof shall be appointed or elected, as the case may be, in such manner as shall be provided by the governor and legislature of the Territory." The "inherent right" relied upon in the case at bar is that which was referred to at length by Judge Cooley in the case of *The People* v. *Hurlbut,* reported in 24 Mich. 44. Conceding that the judicial decisions and law writers generally assert "that the state creates the municipal bodies, endows them with such of the functions of corporate life and entrusts them with such share in the local government, as to the legislative judgment shall seem best; that it controls and regulates their action while they exist, subjects them to such changes as public policy may dictate and abolishes them at discretion; in short that the corporate entities are mere agencies which the state employs for the convenience of government, clothing them for the time being with a portion of its sovereignty, but recalling the whole or any part thereof whenever the necessity or usefulness of the delegation is no longer apparent," and understanding this to be "the accepted theory of state constitutional law as regards the municipal governments," the eminent writer and jurist said that "we seldom have occasion to inquire whether this amplitude of legislative authority is or is not too strongly expressed" and that "such maxims of government are very seldom true in any thing more than a general sense" and that "they never are and never can be literally accepted in practice." He adds: "Our constitution assumes the existence of counties and townships and evidently contemplates that the state shall continue to be subdivided as it has hitherto been; but it nowhere expressly provides that every portion of the state shall have county or township organizations. It names certain offi-

cers which are to be chosen for these subdivisions, and confers upon the people the right to choose them; but it does not in general define their duties, nor in terms preclude the legislature from establishing new offices, and giving to the incumbents the general management of municipal affairs. If, therefore, no restraints are imposed upon legislative discretion beyond those specifically stated, the township and county government of any portion of the state might be abolished, and the people be subjected to the rule of commissions appointed at the capital. The people of such portion might thus be kept in a state of pupilage and dependence to any extent and for any period of time the state might choose." So premising, he proceeds: "The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the management of their local concerns and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by an inadvertent use of words, they might be found to have conferred upon some agency of their own, the legal authority to take away their liberties altogether." Remarking that the expressed restrictions in constitutions are "very few and simple," he says: "We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case, appears to me too plain for serious controversy. The implied restrictions upon the power of

the legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations. The circumstances from which these implications arise are: *First,* that the constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, *second,* that the liberties of the people have generally been supposed to spring from, and be dependent upon that system."

In view of the historical facts and general principles so recited by him the learned writer says that "the question recurs whether our state constitution can be so construed as to confer upon the legislature the power to appoint for the municipalities, the officers who are to manage the property, interests, and rights in which their own people alone are concerned." The provision of the Michigan constitution, it should be here observed, was that "judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed at such time and in such manner as the legislature shall direct." Impelled by the history, the principles and the implications marshalled by him and construing the language just quoted from the constitution of Michigan, he concluded that "the answer must be, that in examining the whole instrument a general intent is found pervading it, which

226

clearly indicates that these elections are to be by the local voters, and not by the legislature, or by the people of a larger territory than that immediately concerned;" and also that "when the constitution is examined in the light of previous and contemporaneous history, the like general intent requires, in language equally clear and imperative, that the choice of the other corporate officers shall be made in some form, either directly or indirectly, by the corporators themselves."

In Hawaii there has not been the same prior history and the same principles have not prevailed and there is not room for the same implications. Counties, cities and towns and municipal corporations generally were utterly unknown in these islands prior to annexation. The king of each island, before the conquest of Kamehameha I, ruled his domain in his own way, and after the conquest Kamehameha I and succeeding kings and queens each presided at the head of a centralized government, a government of all the islands of the group. During those two periods of time there was no familiarity on the part of the people of these islands with the theory or the practice of municipal government as it is understood on the mainland of the United States. When the offer of the government of Hawaii to the government of the United States for annexation was accepted a commission composed partly of citizens of Hawaii and partly of citizens of the United States was entrusted with the duty of devising a form of government for these islands; and upon its recommendation the original Organic Act of Hawaii (later amended in respects not now material) was passed. In that Act there was no reference to any preexisting theory or principle of municipal government to which these islands were accustomed and there was no express command or requirement that there should be immediately a system of such government or the creation of any city or

county or town. Instead we find merely section 56 which, as petitioners expressly and properly concede, is not mandatory but confers merely discretionary powers. Under that section, as is conceded, the legislature of Hawaii could have properly delayed for twenty-five years or for fifty years the creation of municipalities and was not obligated to create them at any time whatever. How, under these circumstances, can it be said that there was existent in Hawaii any such theory or principle or inherent right of local self-government? In our opinion there is not any such inherent right. Our antecedent history, the failure of Congress to recognize the existence of such a right and the positive action of Congress in making the authority of the Hawaiian legislature to create municipalities discretionary and not mandatory, all emphasize this.

"The absence from such written constitution of any guaranty of local self-government is a cogent argument against its existence as a right." *Booth* v. *McGuinness,* 75 Atl. (N. J.) 455, 458. "To say that municipalities have inherent political rights and at the same time admit that all their powers are delegated by the legislature is a contradiction in terms. The principle contended for seems to be both illogical and paradoxical." *Booten* v. *Pinson,* 89 S. E. (W. Va.) 985, 990.

In another respect the case at bar differs from that of *The People* v. *Hurlbut.* The people of Hawaii did not choose or promulgate their present constitution, the Organic Act. The people of Michigan drafted and put into effect the constitution to which Judge Cooley was referring. The possibility of implications from that fact in Michigan as to unwritten reservations of powers and established principles does not exist in Hawaii. The Organic Act, although Hawaii through its minority commissioners had some share in the drafting of it, was given

us by Congress under its constitutional power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." (Article IV Const., Sec. 3.) Ever since annexation we have been and now are subject to that same power of Congress. We cannot be said to have reserved anything by implication, even though, as is not the case, there were here any such prior history as that which was so persuasive to Judge Cooley's mind.

The views of Judge Cooley concerning the existence of an unwritten inherent right to local self-government in the form of municipalities have been adopted in Indiana and Kentucky, but have not been followed in the great majority of states.

The power of Congress to govern the territories is beyond question. In some of the cases it is said to be derived from the power to acquire territory. In most instances, perhaps, it is traced directly to the above quoted section 3 of Article IV of the Constitution of the United States which confers in express terms the power to make all needful rules and regulations respecting the Territory and other property belonging to the United States.

"The power of Congress over the territories of the United States is general and plenary, arising from and incidental to the right to acquire the territory itself and from the power given by the constitution to make all needful rules and regulations respecting the territory or other property belonging to the United States. * * * In the organic act of Dakota there was not an express reservation of power in Congress to amend the acts of the territorial legislature, nor was it necessary. Such a power is an incident of sovereignty, and continues until granted away. Congress may not only abrogate laws of the territorial legislatures, but it may itself legislate directly for the local government. It may make a void act

of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the territories and all the departments of the territorial governments. It may do for the territories what the people, under the Constitution of the United States, may do for the states. * * * But that question is, we think, no longer open to discussion. It has passed beyond the stage of controversy into final judgment. The people of the United States as sovereign owners of the national territories have supreme power over them and their inhabitants." *Mormon Church* v. *United States,* 136 U. S. 1, 42, 43, 44.

This power of Congress to govern the Territory includes the power to create municipalities and to abolish them entirely or to modify them by making additions or subtractions of territory and by making additions or withdrawals of powers. "The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States whether they have been incorporated or not, to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such territory of representative government if it is considered just to do so, and to change such local governments at discretion. The plentitude of the power of Congress as just stated is conceded by both sides to this controversy. It has been manifest from the earliest days and so many examples are afforded of it that to refer to them seems superfluous. However, there is an instance which exemplifies the exercise of the power substantially in all its forms, in such an apt way that reference is made to it. The instance referred to is the District of Columbia, which has had from the beginning different forms of government conferred upon it by Congress, some largely representa-

tive, others only partially so, until at the present time the people of the District live under a local government totally devoid of local representation, in the elective sense, administered solely by officers appointed by the President, Congress, in which the District has no representative in effect, acting as the local legislature. In some adjudged cases the power to locally govern at discretion has been declared to arise as an incident to the right to acquire territory. In others it has been rested upon the clause of section 3, Article IV, of the Constitution, which vests Congress with the power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States. But this divergence, if not conflict of opinion, does not imply that the authority of Congress to govern the territories is outside of the Constitution, since in either case the right is founded on the Constitution, although referred to different provisions of that instrument." *Downes* v. *Bidwell,* 182 U. S. 244, 289, 290.

In the Organic Act no reason is to be found for supposing that Congress intended to grant to our local legislature, concerning municipalities, any less power than that possessed by Congress itself. In section 55 it is declared that "the legislative power of the Territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable." While certain exceptions or limitations are stated, they are not relevant to the present controversies. Doubtless to make it clear beyond dispute that the power to create municipalities was included, Congress went on to say in section 56 that "the legislature may create counties and town and city municipalities within the Territory of Hawaii and provide for the government thereof and all officials thereof shall be appointed or elected, as the case may be, in such manner as shall be

provided by the governor and legislature of the Territory.". We are unable to find in this provision any such limitation as is contended for by· the petitioners that the officials of the municipalities are to be appointed by the municipal authorities or elected by the people of each municipality alone. It would be judicial legislation to so construe the section. The language is clear that the officials are to be appointed ·or elected, as the case may be, "in such manner as shall be provided by the governor and legislature of the 'Territory." No exceptions or qualifications are stated. The power of the legislature is supreme in the matter of determining how the officials shall be appointed and how they shall be elected. It was left by Congress to the legislature to determine if and when one or more municipalities could, with benefit to the people, be created within the Territory. It was made possible for the legislature by its inaction to say for an indefinite period of time that there should be no municipalities; and so, also, it was left for the legislature to say whether the creation of any given municipality should be accomplished at one time or should be accomplished by a series of successive steps, by way of experimentation at first. Congress made it possible for the legislature to do as it has done in the case of Honolulu, to-wit: in creating the municipality to give it certain powers, not including the possession or management of any water works, and later to add to those powers by giving the newly created municipality possession and control and direction of the water works. The legislature was authorized to create one municipality with certain powers and another with certain greater or lesser powers and to create one, as it did in the case of Kalawao, with scarcely more than a name, reserving all of the powers of management of that part of the Territory to the territorial government itself.

As stated by the Supreme Court of the United States

in *Metropolitan Railroad Co.* v. *District of Columbia*, 132 U. S. 1, 8, local self-government is not required by any inexorable principle, nor is it an indispensable feature of a municipality that its officers should be elected by the people or that they should be appointed in any particular way. In that case the court said, *inter alia:* "The mode of appointing its officers does not abrogate its character as a municipal body politic. We do not suppose that it is necessary to a municipal government, or to municipal responsibility that the officers should be elected by the people. Local self-government is undoubtedly desirable where there are not forcible reasons against its exercise. But it is not required by any inexorable principle. All municipal governments are but agencies of the superior power of the state or government by which they are constituted, and are invested with only such subordinate powers of local legislation and control as the superior legislature sees fit to confer upon them. The form of those agencies and the mode of appointing officials to execute them are matters of legislative discretion. Commissioners are not unfrequently appointed by the legislature or executive of a state for the administration of municipal affairs, or some portion thereof, sometimes temporarily, sometimes permanently. It may be demanded by motives of expediency or the exigencies of the situation; by the boldness of corruption, the absence of public order and security, or the necessity of high executive ability in dealing with particular populations. * * * 'Nor can it in principle,' said Mr. Justice Hunt in the *Barnes* case, 'be of the slightest consequence by what means these several officers are placed in their position, whether they are elected by the people of the municipality or appointed by the President or a governor. The people are the recognized source of all authority, state and municipal, and to

this authority it must come at last, whether immediately or by a circuitous process.' "

In the majority of American jurisdictions it is now held that in the absence of constitutional restrictions to the contrary the state which may create municipalities may also destroy them as a whole or may modify their organization and may add to or take away from their property and powers.

"It must now be conceded that the great weight of authority denies *in toto* the existence, in the absence of special constitutional provisions, of any inherent right of local self-government which is beyond legislative control." 1 Dill. Mun. Corp. (5th Ed.) 154.

"Nearly all late cases seem to recognize no other restrictions on the legislature than the express or implied constitutional provisions of the given state." 1 McQuillin Mun. Corp. (2d Ed.) 517, Sec. 191.

"Within constitutional limits the people of the state, acting through the general legislature, may delegate to the municipalities such portion of political power as they may deem expedient, may withhold other powers and may withdraw any part of that which has been delegated." *Van Cleve* v. *Passaic Commissioners,* 71 N. J. L. 183, 198. As other examples see *Coyle* v. *Gray,* 30 Atl. (Del.) 728, 734; *David* v. *Portland,* 12 Pac. (Ore.) 174, 183, 184; and *Tulsa* v. *Gas Co.,* 4 F. (2d) 399, 403.

Without referring further to decisions of state courts on the subject, it is sufficient that the Supreme Court of the United States has repeatedly and in clear language expressed the same view.

"A municipal corporation, in the exercise of all of its duties, including those most strictly local or internal, is but a department of the state. The legislature may give it all the powers such a being is capable of receiving, making it a miniature state within its locality. Again:

it may strip it of every power, leaving it a corporation in name only; and it may create and recreate these changes as often as it chooses, or it may itself exercise directly within the locality any or all the powers usually committed to a municipality. We do not regard its acts as sometimes those of an agency of the state, and at others those of a municipality; but that, its character and nature remaining at all times the same, it is great or small according as the legislature shall extend or contract the sphere of its action." *Barnes* v. *District of Columbia,* 91 U. S. 540, 544, 545.

"Municipal corporations are mere instrumentalities of the state, for the convenient administration of government; and their powers may be qualified, enlarged or withdrawn at the pleasure of the legislature." *Tippecanoe County* v. *Lucas,* 93 U. S. 108, 114.

"Counties, cities and towns are municipal corporations, created by the authority of the legislature; and they derive all their powers from the source of their creation, except where the constitution of the state otherwise provides. * * * Trusts of great moment, it must be admitted, are confided to such municipalities and in turn they are required to perform many important duties as evidenced by the terms of their respective charters. Authority to effect such objects is conferred by the legislature; but it is settled law that the legislature in granting it does not devest itself of any power over the inhabitants of the district which it possessed before the charter was granted. Unless the constitution otherwise provides, the legislature still has authority to amend the charter of such a corporation, enlarge or diminish its powers, extend or limit its boundaries, divide the same into two or more, consolidate two or more into one, overrule its action whenever it is deemed unwise, impolitic or unjust and even

abolish the municipality altogether in the legislative discretion." *Laramie* v. *Albany*, 92 U. S. 307, 308.

"Corporations of the kind are composed of all the inhabitants of the territory included within the political organization, each individual being entitled to participate in its proceedings; but the powers of the organization may be modified or taken away at the mere will of the legislature, according to its own views of public convenience, and without any necessity for the consent of those composing the body politic. Corporate rights and privileges are usually possessed by such municipalities; and it is equally true that they are subject to certain legal obligations and duties, which may be increased or diminished at the pleasure of the legislature, from which all their powers are derived. Institutions of the kind, whether called cities, towns, or counties, are the auxiliaries of the state in the important business of municipal rule; but they cannot have the least pretension to sustain their privileges or their existence upon any thing like a contract between themselves and the legislature of the state, because there is not and cannot be any reciprocity of stipulation between the parties, and for the further reason that their objects and duties are utterly incompatible with every thing partaking of the nature of compact. Instead of that, the constant practice is to divide large municipalities and to consolidate small ones, or set off portions of territory from one and annex it to another, to meet the wishes of the residents or to promote the public interests as understood by the legislature,—it being everywhere understood that the legislature possesses the power to make such alterations and to apportion the common property and burdens as to them may seem just and equitable. Alterations of the kind are often required to promote the public interests or the convenience and necessities of the inhabitants; and the public history shows that it has been

the constant usage in the states to enlarge or diminish
the power of towns, to divide their territory by set-off
and annexation, and to make new towns whenever the
legislature deems it just and proper that such a change
should be made. Old towns may be divided and new ones
incorporated out of parts of the territory of those pre-
viously organized; and in enacting such regulations the
legislature may apportion the common property and the
common burdens, and may, as between the parties in in-
terest, settle all the terms and conditions of the division
of their territory, or the alteration of the boundaries, as
fixed by any prior law." *Mount Pleasant* v. *Beckwith,*
100 U. S. 514, 524, 525.

"Whatever may have been the practice of the state in
the past, it cannot be doubted that the power of the legis-
lature over all local municipal corporations is unlimited,
save by the restrictions of the state and federal constitu-
tions.". *Williams* v. *Eggleston,* 170 U. S. 304, 310.

"A municipal corporation is simply a political sub-
division of the state, and exists by virtue of the exercise
of the power of the state through its legislative depart-
ment. The legislature could at any time terminate the
existence of the corporation itself, and provide other and
different means for the government of the district com-
prised within the limits of the former city. The city is
the creature of the state. *East Hartford* v. *Hartford
Bridge Co.,* 10 How. 511, 533, 534. As is stated in *United
States* v. *Railroad Company,* 17 Wall. 322, 329, a munici-
pal corporation is not only a part of the state but is a por-
tion of its governmental power. 'It is one of its creatures,
made for a specific purpose, to exercise within a limited
sphere the powers of the state. The state may withdraw
these local powers of government at pleasure, and may,
through its legislature or other appointed channels, gov-
ern the local territory as it governs the state at large. It

may enlarge or contract its powers or destroy its existence.'" *Worcester* v. *Street Railway Co.,* 196 U. S. 539, 548, 549.

"Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. * * * The state, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the state and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it." *Hunter* v. *Pittsburgh,* 207 U. S. 161, 178, 179. Precisely the same language last quoted was repeated in *Pawhuska* v. *Pawhuska Oil & Gas Co.,* 250 U. S. 394, 397, 398.

"In the absence of state constitutional provisions safe-

guarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state and the state may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state, exercising and holding powers and privileges subject to the sovereign will." *Trenton* v. *New Jersey*, 262 U. S. 182, 187. In this latter case statements of the law contained in the earlier cases hereinabove quoted from are repeated with approval. See also 1 Dill. Mun. Corp. 154, 155.

The distinction sometimes noted in the books between the operations of a municipality in what is there called its governmental capacity and its operations in its proprietary capacity is not material in such a case as this. The distinction is observed with reference to the liability or nonliability of the corporation to individuals for injuries done to them, but it is irrelevant when we are considering the relative powers of the municipality and of the state or territory which brought it into being. "The basis of the distinction is difficult to state and there is no established rule for the determination of what belongs to the one or the other class. It originated with the courts. Generally it is applied to escape difficulties in order that injustice may not result from the recognition of technical defenses based upon the governmental character of such corporations. But such distinction furnishes no ground for the application of constitutional restraints here sought to be invoked by the City of Trenton against the State of New Jersey. They do not apply as against the state in favor of its own municipalities." *Trenton* v. *New Jersey*, *supra*, 191, 192. See also *Barnes* v. *District of Columbia*, *supra*, 545.

That property used in a system of water works and

the powers granted in connection therewith may, as freely as other property and powers, be withdrawn from the jurisdiction of the municipality is specifically held in *Trenton* v. *New Jersey, supra.*

Another contention advanced by the petitioners is that Act 96 contains an invalid delegation of legislative power to the board of water supply, which is not a municipality, in the grant to that board of the power to issue bonds. It seems to us clear that the Act does not grant to the board the power to issue bonds, but simply authorizes the board to say when certain bonds, the character and amount and purposes of which have already been declared and authorized by the legislature, shall be issued. The treasurer of the city and county is directed to issue them whenever the board shall so desire. By Act 150, L. 1925, Act 40, L. 1927, and Act 178, L. 1929 (the parties expressly say in the submission that they do not question the constitutionality of any of these three statutes), the legislature authorized the issuance of these bonds, seven and one-half million dollars in amount. Of these, it appears from the submission, six million have already been issued, leaving one and one-half million to be issued whenever deemed necessary by the board. The purpose for which the money derived from the bonds is to be devoted is specified in Act 96; and it is required by Act 96 that the sale of the bonds be conducted "in accordance with the procedure specified by the law for the sale of such bonds." Nothing is left to the discretion of the board other than the determination of the time when the authorized improvements to the water works shall require the money to be derived from the bonds. This much we think can be entrusted to the executive department and is not an exercise of any legislative power.

The provision is that the bonds shall be redeemed out of the revenues of the water works. Assuming that, as a

practical matter, this may not prove to be possible in part, owing to a shortage of revenues or to some unforeseen disaster, the power to direct the municipality to pay for the bonds or, in other words, for the water works or its extensions out of its other resources is but a part of the power possessed by the legislature over the municipalities which it creates.

Counsel for the respondents refer to the cases of *Castle* v. *Secretary,* 16 Haw. 769, 777, and *County* v. *Whitney,* 17 Haw. 174, 177, 190, as containing expressions by the justices tending to support their theory of the existence of the inherent right contended for and their view that section 56 of the Organic Act contemplated that the officers of municipalities created thereunder should be appointed by superior officers of the municipality. The expressions so referred to are, by Mr. Justice Hartwell in the earlier case: "As a measure intended to establish self-government over local affairs, a principle which is the basis of our state and national systems, it" (the County Act) "has been urged by all parties. * * * It is essential for the welfare of Hawaii, for the security of life and property that the measure devised for establishing this principle, imperfect in many details and to a certain extent tentative as it well may be and yet be a valid measure, shall be free from such radical defects as would defeat its object;" by the same justice in the second case: "It will be seen that the foregoing discussion assumes that providing a government for towns and cities means providing for their self-government;" and by Chief Justice Frear, also in the later case: "It was not intended to prohibit the delegation to counties of the quasi legislative powers commonly exercised by them as government or auxiliary agents of the state, and for local purposes. * * * This would defeat, rather than promote, that peculiarly American feature of Republican government,

which is one of decentralization, 'the primary and vital idea of which is that local affairs shall be managed by local authorities.' " Passing by the fact that Mr. Justice Hartwell, in the *Castle* case, seems to have disclosed in the words used by him that it was his view that some or all of the provisions of the County Act might well be "to a certain extent tentative," and yet the Act be valid, the expressions thus relied upon fall far short of a statement of the view that municipalities once created could not be destroyed and that property and powers once conferred upon a municipality could not be withdrawn in whole or in part. The precise question now before us was not before the court in either of those cases. The language which it used must be read, as has often been stated by courts, in the light of the facts and the issues then under consideration.

The power conferred upon the commissioners by Act 96 to prescribe and to collect water rates is not an exercise of the power of taxation. The purpose of the Act is to provide water for those of the inhabitants of this city who may choose to secure it from that source. There is no compulsion upon any person or other entity to purchase or take water from the system thus provided for. The rates are plainly intended as compensation for water purchased; that is, as the purchase price of the water. They do not constitute a forcible exaction from the residents for the support of the government.

While upon its face Act 96 may well be understood to furnish merely a temporary expedient for the betterment and the firm establishment of a system of water works for the city of Honolulu and to contemplate a return *in toto* of the possession and of the control of the water works to the City and County of Honolulu after the lapse of a short period of years, we have preferred to treat the Act as though the legislature had thereby sought to take away

from the City and County of Honolulu completely and for all time the possession, the control and the direction of the water works,—believing that such a treatment of the subject would be more satisfactory to all concerned.

In our opinion it was within the power of the legislature of Hawaii to pass Act 96 and to take away from the City and County of Honolulu, either temporarily or permanently, the water works system and all property used in connection therewith, and to vest the possession, control and direction of the property and water works in the board of water supply. Judgment will be entered in favor of the board of water supply in accordance with the terms of the submission.

*A. G. Smith, C. A. Gregory* and *C. E. Cassidy,* Deputy Attorney General (*Smith, Wild & Hoppe, C. A. Gregory* and *C. E. Cassidy* on the brief), for plaintiffs.

*B. S. Ulrich (Ulrich & Hite* on the briefs) for defendants.

*A. Withington (J. G. Anthony* with him on the brief) *amicus curiae.*