[Nos. 40222, 40223.  En Banc.  May 14, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT A. ZORNES *et al., Appellants.**

*Reported in 475 P.2d 109.

*Peterson, Taylor & Day,* for appellants.

*C. J. Rabideau,* for respondent.

ROSELLINI, J.—The defendants, husband and wife, who were both 22 years of age at the time of the trial of this action, were found guilty of a violation of RCW 69.33.410 (the Uniform Narcotic Drug Act). The evidence upon which they were convicted showed that about a half dozen officers raided their home on the night of August 11, 1967. The defendants were lying on the lawn at the time, watching for meteors. A thorough search of the premises uncovered some marijuana cigarette ends in garbage cans and a few bits of marijuana in a match box.

Insofar as the record discloses, neither of the defendants had ever before been convicted of a crime. The defendant Robert Zornes received a minimum sentence of 5 years and a maximum of 20 years in the state penitentiary, while the sentencing of the defendant Jenice Zornes was deferred for 6 years. She was ordered to spend 1 year in the county jail.

While this case was pending before this court, the legislature enacted Laws of 1969, 1st Ex. Ses., ch. 256, which provides (in those portions pertinent to the present case) as follows:

Sec. 7. Section 69.33.220, chapter 27, Laws of 1959 and RCW 69.33.220 are each amended to read as follows:

The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

. . .

(13) "Narcotic drugs" mean coca leaves, . . . any other drugs to which the federal laws relating to narcotic drugs may now apply; and any drug found by the board of pharmacy, . . . to have addiction-forming or addiction-sustaining liability similar to morphine or cocaine, . . . PROVIDED, *That narcotic drugs shall not include cannabis and the provisions of this chapter shall not ever be applicable to any form of cannabis.*

. . .

Sec. 9. Section 1, chapter 6, Laws of 1939 as last amended by section 1, chapter 71, Laws of 1967 and RCW 69.40.060 are each amended to read as follows:

. . . (2) It shall be unlawful for a person, firm or corporation to sell, give away, barter, exchange or distribute any part of the plant Cannabis Sativa L., commonly known as marihuana, . . .

Sec. 10. Section 2, chapter 6, Laws of 1939 as amended by section 23, chapter 38, Laws of 1963, and RCW 69.40.070 are each amended to read as follows:

Whoever violates any provision of chapter 69.40 RCW, and said violation solely involves the drug cannabis, commonly known as marihuana, shall, upon conviction, be fined and imprisoned as herein provided:

(1) For the first offense, the offender shall be guilty of a misdemeanor, and punishable by a fine not exceeding five hundred dollars or by imprisonment in the county jail, not exceeding six months, or by both such fine and imprisonment;

. . .

Sec. 11. There is added to chapter 69.40 RCW a new section to read as follows:

Cannabis as *now or hereafter defined by the Washington state board of pharmacy shall be a dangerous drug as defined herein and accordingly shall be subject to the provisions of chapter 69.40 RCW and shall not be considered a narcotic drug and accordingly not subject to the provisions of chapter 69.33 RCW as now law or hereafter amended.*

(Italics ours.)

Thus the legislature, in explicit language, took cannabis out of the Narcotic Drug Act (RCW 69.33.220) and specifically included it in the dangerous drug act (RCW 60.40.060). In that act, RCW 69.40.061 provides:

It shall be unlawful for any person to possess any of the drugs described in RCW 69.40.060, as amended from time to time, or any other drug which is required by any applicable federal or state law or federal regulation or Washington state pharmacy board regulation to be used only on prescription, except upon the order or prescription of a physician, surgeon, dentist or veterinary surgeon duly licensed to practice in the state of Washington: *Provided, however,* That the above provisions shall not apply to the possession by drug jobbers, drug wholesalers and drug manufacturers, to registered pharmacists or to physicians, dentists or veterinary surgeons.

■ It was the well-defined rule at common law that where a statute is repealed, it is, as regards its operative effect, considered as if it had never existed, except as to matters and transactions past and closed, and all pending litigation must be decided according to the state of the law at the time of the decision. 1 J. Sutherland, Statutes and Statutory Construction § 286 (166) (2d ed. 1904); G. Endlich, A Commentary on the Interpretation of Statutes § 478 (1888). *State v. Allen,* 14 Wash. 103, 44 P. 121 (1896); *and see Ettor v. Tacoma,* 57 Wash. 50, 106 P. 478, 107 P. 1061 (1910).

However, in 1901 the legislature enacted Laws of 1901, Ex. Ses., ch. 6, § 1, p. 13 (now RCW 10.01.040) which provides:

No offense committed and no penalty or forfeiture incurred previous to the time when any statutory provision shall be repealed, whether such repeal be express or implied, shall be affected by such repeal, unless a contrary intention is expressly declared in the repealing act, and no prosecution for any offense, or for the recovery of any penalty or forfeiture, pending at the time any statutory provision shall be repealed, whether such repeal be express or implied, shall be affected by such repeal, but the same shall proceed in all respects, as if such provision had not been repealed, unless a contrary intention is expressly declared in the repealing act. Whenever any

criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

This statute, being in derogation of the common law, must be strictly construed. *Marble v. Clein,* 55 Wn.2d 315, 347 P.2d 830 (1959). Since the statute does not require that an intent to affect pending litigation be stated in express terms, but merely provides that the intent must be "expressed" in the statute, we construe the statute as authorizing the expression of such an intent in words that fairly convey that intention.

While the 1969 act does not contain the words, "This act shall apply to pending cases," it contains language from which the intent that it shall apply to such cases can be reasonably inferred.

Section 7(13) conveys that intent when it says: ". . . the provisions of this chapter shall not ever be applicable to any form of cannabis."

▮ In construing a statute, the court seeks to find the legislative intent, and to give effect to the legislative purpose. Courts will not ascribe to the legislature a vain act, and a statute should, if possible, be so construed that no clause, sentence, or word shall be superfluous, void, or insignificant. *Kasper v. Edmonds,* 69 Wn.2d 799, 420 P.2d 346 (1966).

▮ If the act in question is to have only prospective effect, the words "not ever" preceding the words "be applicable" are unnecessary. We must assume that the legislature added these words for a purpose, and that purpose it would seem is to direct the courts to refrain from applying those provisions to offenses involving cannabis. If the provisions of the uniform narcotics act are not "ever" to be

applied to cannabis, then they are not to be applied in any case, whether pending or arising in the future.

The conclusion that this was the legislative intent is inescapable when the 1969 law applicable to cannabis or marijuana is viewed in its relation to prior law and in the light of presently known facts about cannabis of which the legislature was presumably aware.

The penalty provision of RCW 69.33.410 (Laws of 1963, ch. 38, § 20), which expressly included cannabis within the definition of narcotic drugs, and which was applicable to the offense with which the defendants were charged, provided, insofar as pertinent to this case:

(1) For the first offense the offender shall be guilty of a felony and the court shall impose a fine of not to exceed ten thousand dollars and a sentence of not less than five years or more than twenty years in the state penitentiary, or both such fine and imprisonment;

The penalty provision of RCW 69.40.070 (Laws of 1963, ch. 38, § 23) (poisons and dangerous drugs) provided the following in regard to first offenders:

(1) For the first offense, the offender shall be guilty of a misdemeanor, and punishable by a fine not exceeding two hundred dollars or by imprisonment in the county jail, not exceeding six months, or by both such fine and imprisonment;

It would appear that the "act" for which the defendants were prosecuted under RCW 69.33.230 (narcotic drugs), that is, the possession of marijuana, was also punishable under RCW 69.40.061 (Laws of 1967, ch. 71, § 2) (dangerous drugs), which makes unlawful the possession of any of the drugs described in RCW 69.40.060 (Laws of 1967, ch. 71, § 1). That section provides, insofar as pertinent to this discussion:

It shall be unlawful for a person . . . to sell, . . . amytal, luminal, veronal, barbital, acid diethylbarbituric, or any salts, derivatives, or compounds thereof, . . . any amphetamine or any dextroamphetamine, . . . dimethyltriptamine, lysergic acid, mescaline, peyote, psilocin, . . . any drug found by federal law or regulation or Washington state pharmacy board regu-

lation to have a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect; or any other drug which is required by any applicable federal or state law or federal regulation or Washington state pharmacy board regulation to be used only on prescription, except upon the written or oral order or prescription of a physician . . .

The narcotics addiction statute, RCW 69.32.080, provides:

It shall be unlawful for any person to use . . . any narcotic drug as defined in the uniform narcotic drug act, RCW 69.33.220 as now or hereafter amended, except as prescribed and under the direction of a physician . . .[1]

Cannabis, being defined as a narcotic in RCW 69.33.220(13), is thus a drug which falls within the description "any other drug which is required by any applicable federal or state law . . . to be used only on prescription . . ."

■ Where two statutes apply to the same subject matter, we bear in mind that the two statutes will be reconciled if possible so that effect can be given to each. It is the contention of the appellants that, under these statutes, the prosecutor is given an unlawful option to charge either a felony or a misdemeanor. In opposition to this theory, it is urged that reconciliation of these two statutes can be achieved if RCW 69.40 *et seq.* (dangerous drugs) is viewed as not embracing narcotic drugs, and that this result can be reached by applying the rule that, where specific words or phrases are used in a statute, followed by general words or phrases, the specific words or phrases govern the character or kind of matter included in the general words. *State v. Sterling Theatres Co.,* 64 Wn.2d 761, 394 P.2d 226 (1964).

The argument that the dangerous drug act was not meant to apply to narcotic drugs is persuasive, for the dangerous drug act does not list any narcotic drugs, as that

---

[1]Although RCW 69.32.080 permits the use of cannabis on prescription, it is apparently not prescribed for any medicinal purpose in this country. In other parts of the world, however, it has been thought to have medicinal properties. *See* A. Lindesmith, *The Addict and the Law,* Indiana University Press (1965), pp. 223-226.

term is defined in various dictionaries[2] and those drugs which are listed evidently are considered dangerous because of their stimulant or depressant effect on the central nervous system or their hallucinogenic effect.

We may assume that the legislature did not intend this act to apply to narcotic drugs. But this assumption does not answer the question whether the act includes cannabis, for cannabis is not in fact a narcotic drug, even though the legislature did, in another act, define it as such. As the references cited in note 2 make clear, a narcotic drug is one which induces deep sleep and makes an individual insensitive to pain. Describing the effects of cannabis, the co-authors of an article appearing in an official publication of the federal courts and the Bureau of Prisons, have said:

> Acute physical symptoms frequently include conjunctival vascular injection, dryness of the mouth and pharynx, irritation of the throat, increased sensitivity to light, sound, touch, and pain stimuli, and such changes in the autonomic nervous system as increase in pulse, blood pressure, and tendon reflexes. Ataxia, the impaired ability to coordinate voluntary muscular movements, may also occur. Appetite is often stimulated. There is no evidence that marihuana increases sexual potency. There are as yet no recognized lasting ill effects directly attributed to the brief use of marihuana nor has a death been reported in this country due to overdosage.
>
> The mental changes following marihuana use are variable and depend in part upon the expectations and prior drug experience of the user and the social setting at the time of use; thus, the meaning of the experience is largely socially acquired. *Marihuana is primarily classi-*

---

[2]*Merriam-Webster Third Int'l Dictionary (1964):*
"Narcotic: 1: a drug (as of the opium, belladonna, or alcohol groups) that in moderate doses allays sensibility, relieves pain, and produces profound sleep but that in poisonous doses produces stupor, coma, or convulsions."

*Gould's Medical Dictionary (5th ed.):* "Narcotic: . . . 2. A drug that produces narcosis . . . Narcosis: The state of complete unconsciousness produced by a narcotic drug or an anesthetic."

*Dorland's Illustrated Medical Dictionary (24th ed.):* "Narcotic: 1. Pertaining to or producing narcosis. 2. An agent that produces insensibility or stupor."

*Black's Law Dictionary:* No definition given.

*Bouvier's Law Dictionary:* No definition given.

*fied as a hallucinogen even though intoxication may in-clude both early stimulant and later depressant effects.* A decreased sense of fatigue, relaxation, and increased self-confidence has been described. There may be a distortion of affect toward omnipotency and a perception of "insight" rarely shared by the unintoxicated. The individual is often garrulous, giggly, and talk is disconnected. Associated with a period of euphoria, or well-being, there may be distortions of time, space, color, and other sensory perception with increased dosage.

Depersonalization, the perception of the physical body as not self, has been described with use. While this distortion might be expected to increase the likelihood of self-injury, we know of no documentation to confirm this expectation.

Increased suggestibility, decreased judgment, and change of affect may be followed by depression and sleep. There may also be delusions, hallucinations, suspiciousness, panic, and fear of death. Violent or aggressive behavior is unusual. While occasional persons may be especially sensitive to even small doses, with the result that a psychotic-like state is produced, there is recent evidence that almost all persons are so affected with sufficient dosage. A puzzling observance is that many of the persons who have had frightening episodes in their marihuana experience wish to repeat it.

In summary, the acute effects of marihuana smoking commonly include a euphoric state accompanied by motor excitation and mental confusion. These reactions are often followed by a period of dreaminess, depression, and sleep. The wide variety of individual reactions appears to be more closely related to personality differences (including expectations and emotional arousal) and the cultural setting of use than to any specific property of the drug itself. Recognizing this variability, one user remarked that "every person has the dream he deserves."

(Italics ours.) (Footnotes omitted.) D. Pet, M.D., and J. Ball, Ph.D., Marihuana Smoking in the United States, 32 Federal Probation 8 (No. 3, 1968), published by the Administrative Office of the United States Courts in Cooperation with the Bureau of Prisons of the Department of Justice, Washington, D. C.; *see also* A. Lindesmith, The Addict and the Law, Indiana University Press (1965), at 222-242.

The consensus is that cannabis is not a narcotic but rather is a mild hallucinogenic and that it has a stimulating and depressant effect on the central nervous system.[3] Thus it is a drug of the type included within the dangerous drug act. It may be convincingly argued that when, in RCW 69.40.060, the legislature used the phrase, "or any other drug which is required . . . to be used only on prescription," it meant that phrase to apply only to dangerous drugs as previously defined therein. Nevertheless, the fact is that cannabis fits within that definition. The fact that the legislature once defined it as a "narcotic" is not controlling as we are here concerned with the true nature of the drug in order to determine whether it comes within the terms of this statute as it is written.[4]

---

[3]A very recent confirmation of this evaluation appeared in a series of articles written by A. Blakeslee, Associated Press Science Writer, entitled *Safeguarding Teens—Parents Need Knowledge for a Wise Discussion About Drugs and Abuse.* In the March 13, 1969, issue of the Seattle Post-Intelligencer at page 5, the author says:

It's more commonly known as pot, grass, Mary Jane, hay, joint, reefer, stick or by a dozen other names.

As generally used in the United States, marijuana is a mild drug that produces fantasies. Smokers may develop a psychological need for it. But it is not physically habit forming—quitting it doesn't cause any physical withdrawal symptoms.

It is not a narcotic, and neither are other hallucination-producing drugs. Marijuana is under narcotics control for various reasons. But true narcotics usually produce sleep or stupor and relieve pain; they can be addictive or habit forming.

Marijuana comes from the female hemp plant, cannabis sativa. The leaves and flowering tops are dried, sometimes are mixed with tobacco, and rolled into a cigarette.

The effects, felt in a few minutes, usually last three to five hours, but may go on for 12. Reefers can vary widely in potency, depending on their content of the active plant ingredient.

Typically, most smokers have a feeling of great well-being, of feeling high, like having had a few alcoholic drinks. They may become talkative and hilarious, or fall into a dreamy state. Their ideas flow rapidly, sometimes in disconnected fashion.

They fantasize, and sometimes have a deeper appreciation of works of art or music. Time stretches out. Distance and sounds are magnified.

Other smokers may feel irritable and confused, or become fearful.

[4]The Uniform Narcotic Drug Act containing this definition, was adopted by the Washington State Legislature in 1951 (Laws of 1951, 2d

In its 1969 amendments to the narcotic drug act and the dangerous drug act, the legislature tacitly acknowledged that cannabis has always belonged in the dangerous drug act and not in the narcotic drug act. It evidently took cognizance of what is now generally known about cannabis— that its use does not lead to addiction, that is, its use can be discontinued without withdrawal symptoms, such as are suffered by opium addicts and alcoholics. The human body does not develop a tolerance to it, as it does to opium and alcohol. Some individuals may become emotionally dependent upon it, and it may indeed have no beneficial effects, but its use does not, in itself, create problems of addiction.[5]

■ Assuming that the legislature was not aware of these facts when it enacted the 1967 act, it nevertheless used words which described cannabis so as to include it within the provisions of that act. Members of the legislature are presumed to know the meaning of the words they write into their enactments. *Union Oil Co. v. State*, 2 Wn.2d 436, 98 P.2d 660 (1940). Cannabis is a drug required by applicable state law to be sold only on prescription, which has a stimulant and/or depressant effect on the central nervous system and an hallucinogenic effect.

The fact that the legislature did, in another act, define it as a "narcotic drug" did not change its nature and give it properties which it does not possess.

It is proper to restrict the application of a statute so that general language is held to embrace only things of like kind to those which are enumerated in the preceding specific language, but we know of no rule which requires the

Ex. Ses., ch. 22), apparently without any independent investigation of the factual basis for the assumptions contained therein. See Drug Addiction: Crime or Disease?, Interim and Final Reports of the Joint Committee of the American Bar Association and the American Medical Association on Narcotic Drugs, Indiana University Press (1961), at 12; D. Pet, M.D., and J. Ball, Ph.D., *supra;* A. Lindesmith, n. 1, *supra.* These studies indicate that much more is known now about the effects and nature of narcotic drugs and marijuana than was known when the Uniform Act was promulgated, but there is still much to be learned.

[5]The problem of the addict which is probably the most objectionable to society is that he will commit crimes, if necessary, in order to obtain his drug.

court to further restrict it so as to exclude from its operation those things which, though of the same kind in fact, have been declared by the legislature to be of another kind. It is doubtful whether a legislative declaration contrary to all the evidence can be sustained as constitutional, if its effect is to deny to a defendant equal treatment under the law. *See Skinner v. Oklahoma*, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942); *Seattle v. Stone*, 67 Wn.2d 886, 410 P.2d 583 (1966); *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960). *See also, Note: Substantive Due Process and Felony Treatment of Pot Smokers: The Current Conflict*, 2 Ga. L. Rev. 247 (1968). In any event, it cannot restrict this court in seeking the reasonable meaning of language contained in a statute.

If it was the legislative intent to pass an enactment controlling all nonnarcotic drugs which stimulate or depress the central nervous system and/or produce hallucinatory effects, it was its intent to control cannabis, as that intent is expressed in the statute.[6] The 1969 enactment, expressly including cannabis as a dangerous drug and removing it from the coverage of the narcotic drug act, shows conclusively that the legislature is presently aware that cannabis is not a narcotic drug and that it properly should be classed with "dangerous drugs" as they have been defined in RCW 69.40.061.

As the defendants maintain, there were on the statute books, at the time of the arrest, two conflicting statutes

---

[6]Of interest is RCW 9.91.030 (Laws of 1963, ch. 205, § 4) which provides:

Every person who shall open, conduct or maintain, as owner or employee, any place where opium, morphine, alkaloid-cocaine or alpha or beta eucaine or any derivative, mixture or preparation of any of them, or any dangerous drug described in RCW 69.40.060, shall be in any manner used by persons resorting thereto for the purpose; and every person who shall visit or resort to such place for the purpose of using in any manner any of said drugs, shall be guilty of a gross misdemeanor.

It will be observed that cannabis is not expressly mentioned in this statute; therefore if it was the legislative intent to make this statute applicable to persons who resort to places where cannabis is smoked, it must have considered that cannabis was a dangerous drug, as defined in RCW 69.40.060.

pertaining to the penalty for unlawful possession of cannabis.

This court, in *Olsen v. Delmore,* 48 Wn.2d 545, 295 P.2d 324 (1956), approved and adopted the rule that an act which prescribes different punishments for the same act and thereby purports to authorize the prosecutor to charge one person with a felony and another with a misdemeanor for the same act committed under the same circumstances, denies the equal protection of the law guaranteed by the fourteenth amendment to the United States Constitution and article 1, section 12, of the constitution of this state.

While this case was distinguished in *State v. Boggs,* 57 Wn.2d 484, 358 P.2d 124 (1961); *State v. Reid,* 66 Wn.2d 243, 401 P.2d 988 (1965); and in *State v. Canady,* 69 Wn.2d 886, 421 P.2d 347 (1966), it has not been overruled and it is the applicable law in this state.

In *State v. Boggs, supra,* the appellant argued that he was denied equal protection of the laws because of the wide range of discretion given the trial judge in imposing sentence. We pointed out that the evil found in *Olsen v. Delmore, supra,* was in permitting the *prosecutor* to charge either a misdemeanor or a felony for the same violation, and that the rule of that case did not forbid exercise of discretion by a trial judge.

In *State v. Reid, supra,* we held that RCW 69.32.080, 69.33.230 and 69.33.410 do not violate the equal protection clauses inasmuch as they describe two offenses, the elements of which are different. RCW 69.32.080 proscribes unlawful use of narcotics; RCW 69.33.230 and 69.33.410 forbid unlawful possession. Unlawful use is a misdemeanor, while unlawful possession is a felony.[7] The fact that the proof necessary to establish commission of the misdemeanor was greater than that required to prove the felony

---

[7]The minimum penitentiary term prescribed at that time for possession was 1 year. There was no maximum. *See State v. Boggs, supra,* where this court upheld a life sentence imposed for a first offense. The narcotic drug found in the possession of the defendant was not identified in the opinion.

may appear incongruous, but it does not eradicate the distinction between the two offenses.

In discussing this apparent incongruity in *State v. Reid, supra,* we said, at page 247:

> The incongruity disappears when the purposes of the statutes are understood. Illegal possession is potentially much more dangerous to society than illegal use, because the possessor may dispense the drugs to others, whereas the user is affecting mainly himself. Of course, we recognize that often the user of narcotics is also a possessor. If the prosecutor is able to prove each separate crime, then he could charge a person with violations of either or both statutes.[8]

We held that a prosecutor may exercise discretion in deciding whether to prosecute an offender or not, and that he may decide also whether to proceed under one statute or another, provided the facts to be proven are not the same.

---

[8]If the cases which come before this court are fair samples of the cases prosecuted, it would appear that prosecutors have not adopted the view that the "possession" statute was intended by the legislature to ease the prosecutor's task in obtaining convictions of sellers of drugs. *See State v. Weiss,* 73 Wn.2d 372, 438 P.2d 610 (1968) (two cigarettes and small plastic container of seeds and traces of leaves and stems); *State v. Ivey,* 73 Wn.2d 589, 439 P.2d 974 (1968) (two cigarettes); *State v. Givens,* 74 Wn.2d 48, 442 P.2d 628 (1968) (two cigarettes in car); *State v. Robinson,* 75 Wn.2d 230, 450 P.2d 180 (1969) (two cigarettes in car), wherein the quantity possessed by the defendant was patently insufficient to justify an inference that he was a peddler of narcotics. *See Constitutionality of Conviction Under Narcotics Possession Statute,* 41 Wash. L. Rev. 533 (1966). In 1969, the legislature specifically provided that possession with intent to sell cannot be inferred unless a specified amount of cannabis is found in the possession of the defendant.

In the case under consideration, the condition in which the cannabis was found (several butts of used cigarettes and a few sprigs of leaves, stems, and seeds in a match box) suggests that none of it was in a useable condition, much less a saleable condition. The witness who tested the material to determine whether it was Cannabis Sativa L. testified that, if it were all put together, it would probably be enough to make one cigarette. However, the butts were found in trash cans, and it can hardly be inferred that the possessors intended to make further use of them. The appellant husband told the court that he had formerly used marijuana and other drugs, but that he had abandoned their use on the advice of a minister whom he admired. This man's ability to exercise a wholesome influence was discounted by the trial court, which observed that he had some "rather odd views."

In *State v. Canady,* 69 Wn.2d 886, 421 P.2d 347 (1966), we held that a statute which authorized a prosecutor to charge that a crime was committed by a defendant armed with a deadly weapon, or to omit that charge, did not give him "unbridled discretion." Rather, we said, the requirements of proof and his ability to meet them were the considerations which would affect his decision. We distinguished *Olsen v. Delmore, supra.* That case, we said, held that where one statute vested in the prosecutor the power to proceed for either a gross misdemeanor or a felony for the identical act, the defendant's right to equal protection of the laws was violated.

It might be thought that this court was implying that, if the authorization to proceed for either a misdemeanor or a felony was contained in a different statute, there would be no equal protection problem. However, we then cited *State v. Reid, supra,* noting that it distinguished *Olsen v. Delmore, supra,* and said, at page 891:

> The basis for the decision was that the elements of the two crimes differed, and there was a legislative standard for the prosecution to use in determining which offenders should be charged under which statute.

There is no logical basis for drawing a distinction between an authorization contained in one statute, to charge for either a misdemeanor or a felony, and the same authorization contained in different statutes, if the prosecution under either statute is for the identical act. We have in fact recognized that there is no such distinction in law in two cases subsequent to *Olsen.*

In *Walder v. Belnap,* 51 Wn.2d 99, 316 P.2d 119 (1957), we held that RCW 9.54.020 defining the offense of taking a motor vehicle without permission of the owner, had superseded and repealed by implication RCW 9.61.040(8) (injury to property) insofar as it pertained to the taking away of an automobile. We said, at page 101:

> If, as petitioner contends, both statutes are fully operative and, contemporaneously, are the law of this state, permitting the prosecuting authorities the option to prosecute for (1) a misdemeanor or (2) a felony, there

might have been a deprivation of petitioner's constitutional right to equal protection of the law. *In re Olsen v. Delmore,* 48 Wn. (2d) 545, 295 P. (2d) 324.

*State v. Collins,* 55 Wn.2d 469, 470, 348 P.2d 214 (1960), did not refer to *Olsen v. Delmore, supra,* but the rule of that case was recognized. In holding that the negligent homicide statute supersedes the manslaughter statute in all cases where it is applicable, we said:

> This not only accords with the rules of statutory construction, but is the interpretation necessary to satisfy the requirements of the fourteenth amendment to the Federal constitution requiring equal protection of the law for all persons. The principle of equality before the law is inconsistent with the existence of a power in a prosecuting attorney to elect, from person to person committing this offense, which degree of proof shall apply to his particular case.[9]

The rule of *Olsen v. Delmore, supra,* is generally accepted as a proper application of the equal protection clause of the Fourteenth Amendment. *See* the cases cited in 16A C.J.S. *Constitutional Law* § 564 (1956). As the encyclopedia states the rule:

> Generally speaking, the law with respect to the punishment to be inflicted for a crime must operate equally on every citizen or inhabitant of the state, and a statute is void as a denial of the equal protection of the laws which prescribes different punishments or different degrees of punishment for the same acts committed under the same circumstances by persons in like situation.

(Footnotes omitted.)

In *In re Mallon,* 16 Ida. 737, 748, 102 P. 374 (1909), the court said:

> That no one shall be subject to any greater burdens or charges than such as are imposed upon all others under like circumstances, means that such protection shall be extended to every person and everywhere without reference to his position in society, or station in life; whether he lives in town or the country, or whatever color may be the house in which he lives, or whether humble or imposing in structure.

---

[9]*See also, State v. Kanistanaux,* 68 Wn.2d 652, 414 P.2d 784 (1966).

The United States Supreme Court, in *Skinner v. Oklahoma,* 316 U.S. 535, 541, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942), held invalid an Oklahoma law which prescribed sterilization as a punishment of habitual criminals. Under the terms of the law, habitual stealers of chickens were made subject to this punishment, while habitual embezzlers were expressly exempted. Finding that there was no difference in the quality of moral turpitude involved in embezzlement and chicken stealing, and that there was in fact no reasonable basis for the distinction, the court said:

The guaranty of "equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins,* 118 U.S. 356, 369. When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. *Yick Wo v. Hopkins, supra; Gaines v. Canada,* 305 U.S. 337.

It is manifest that RCW 69.33.410 and 69.40.070, as they stood prior to the 1969 amendments, prescribed different punishments for the same act of possession of cannabis, as that offense was defined by RCW 69.33.230 (narcotic drugs) and RCW 69.40.061 (dangerous drugs). There is no basis in the statutes for distinguishing between persons who can be charged with unlawful possession of cannabis under one act and those who can be charged under the other. Thus there existed a serious question whether these provisions gave to the prosecutor the discretion to charge for either a felony or a misdemeanor for the same act committed under the the same circumstances, and consequently denied to one charged with a violation of RCW 69.40.061 the equal protection of the laws.

In view of our conclusion regarding the 1969 legislation we need not decide that question.

When the preexisting state of conflict in the applicable laws, which we have just discussed, and the now generally known facts concerning the nature of cannabis are taken into account, it appears very probable that the legislature proposed to remove that conflict when it enacted chapter

256 of the Laws of 1969, 1st Ex. Ses. When the legislature said that the provisions of the narcotic drug act should "not ever be applicable to cannabis," it manifested an intent to relieve the courts of the necessity of deciding which of the two statutes, both apparently applicable, should control the prosecution and *disposition* of cannabis offenses. At the same time it manifested an intent that the 1969 provisions, rather than the preexisting law, should govern the disposition of such cases, and that cannabis offenders should be treated in the same way that users of other drugs of the same kind were treated, thus avoiding the charge that such offenders are denied equal protection of the laws.

We hold, therefore, that Laws of 1969, 1st Ex. Ses., ch. 256, §§ 7, 9, 10, 11, taking marijuana out of the Uniform Narcotic Drug Act, expresses the intention that its provisions shall apply to pending actions. The charge of unlawful possession of narcotic drugs cannot stand.

The judgment is reversed and the action is dismissed.

HUNTER, C. J., FINLEY and WEAVER, JJ., concur.

HAMILTON and McGOVERN, JJ., concur in the result.

HALE, J. (concurring in the result)—Defendants were convicted by a jury of unlawfully possessing marijuana. The information, without amplification and without specifying the type or kind, simply charged "Possession of Narcotics." Defendants understood, however, that the term "narcotics" in the information meant cannabis, for they did not demand a bill of particulars nor did they claim vagueness. Had they challenged the information or demanded a bill of particulars, the court, in all likelihood, would have sustained their plea of vagueness (RCW 10.37.052) and required the state to specify the nature, kind and type of narcotics alleged to have been in the accuseds' possession. *State v. Royse,* 66 Wn.2d 552, 403 P.2d 838 (1965); *Seattle v. Proctor,* 183 Wash. 299, 48 P.2d 241 (1935); *State v. Catalino,* 118 Wash. 611, 204 P. 179 (1922). Since the information employs the language of the statute and appears legally sufficient, this court must assume from the record

that the defendants knew they were charged with illegal possession of the narcotic drug marijuana in violation of RCW 69.33, the Uniform Narcotic Drug Act.

Subsequent to the entry of judgment against Robert Zornes, sentencing him to 20 years' imprisonment under the Uniform Narcotic Drug Act, the legislature removed cannabis, or marijuana, from the narcotics act and redefined it as a dangerous drug. Laws of 1969, 1st Ex. Ses., ch. 256, p. 2383; RCW 69.40.110. This reduced the punishment, for an earlier legislature had changed a first offense possession of a dangerous drug from a felony to a misdemeanor. Laws of 1963, ch. 38, § 23, p. 377.

One can readily accept the court's statement about marijuana that "The fact that the legislature did, in another act, define it as a 'narcotic drug' did not change its nature and give it properties which it does not possess." But that statement ought not be taken to imply that the legislature could not constitutionally define it or classify it as a narcotic. Accordingly, when the information was filed, cannabis sativa in my judgment was properly defined by statute as a narcotic drug, and the court cannot declare as a matter of law that, because of its medical and chemical properties and physiological effects, marijuana should have been included among the dangerous drugs and not among the narcotics. However, the legislature may have defined or classified marijuana—narcotic, dangerous drug, or neither —it acted in exercise of its powers under the constitution to legislate upon drugs, medicines, pharmaceuticals and biologicals and to define crimes.

Although marijuana might be said to fall within the generic classification of dangerous drugs, I do not see where this gave the prosecuting attorney discretionary powers of selection and enabled that officer to charge the accused of possession as a felony under the Uniform Narcotic Drug Act or as a misdemeanor under the dangerous drug act (RCW 69.40). The Uniform Narcotic Drug Act specifically defines cannabis as a narcotic drug; the prosecuting attorney in charging possession of marijuana had no choice but to designate it as a narcotic drug. That mari-

juana may also be described medically as a dangerous drug, did not, in my opinion, authorize the prosecuting attorney at his discretion to accuse one of possessing it either as a narcotic which is a felony or as a dangerous drug which is a misdemeanor.

The unconstitutional powers of selection denounced in *Olsen v. Delmore,* 48 Wn.2d 545, 295 P.2d 324 (1956), do not exist in the present case in my judgment because there is a difference between possessing narcotics and possessing dangerous drugs. The two crimes have different elements. Proof that the accused unlawfully possessed a dangerous drug would not establish that he possessed a narcotic drug, and vice versa. If there is a difference in any of the elements of two similar crimes or if either will require a difference in proof, they are not identical and the prosecuting attorney, depending upon the evidence available, has a constitutional discretion to decide whichever charge he will bring. *State v. Canady,* 69 Wn.2d 886, 421 P.2d 347 (1966); *State v. Seger,* 1 Wn. App. 516, 463 P.2d 185 (1969); *United States v. Garnes,* 258 F.2d 530 (2d Cir. 1958); *State v. Reed,* 34 N.J. 554, 170 A.2d 419 (1961).

Cannabis sativa, as noted, was expressly named and defined in the Uniform Narcotic Drug Act as a narcotic drug, and was not mentioned in the dangerous drug act. The majority recognizes the familiar rule of statutory construction that the specific governs the general. Applying this rule means that the accused could have been charged only under the statute which specifically defined marijuana as a narcotic. In implying otherwise, the court unnecessarily, I think, beclouds and casts a pall of unconstitutional doubt upon both the Uniform Narcotic Drug Act and the dangerous drug act. I would avoid the implication, therefore, that either or both the Uniform Narcotic Drug Act (RCW 69.33) and the dangerous drug act (RCW 69.40) are unconstitutional.

Regardless of how marijuana may be regarded medically, I think the legislature left no doubt as to its intentions in defining it as a narcotic. It made the legislative purpose unmistakably clear to a person of common understanding

when it explicitly named cannabis as a narcotic drug. The information charged defendants with unlawfully possessing a narcotic drug, meaning marijuana. Under the Uniform Narcotic Drug Act, marijuana was *named* and *specified* as a narcotic drug and was not included in the dangerous drug act as a dangerous drug. In RCW 69.33.220 (13, 14), of the Uniform Narcotic Drug Act (before the 1969 amendment), it was designated as a narcotic through both its scientific and common names, as follows:

(13) "Cannabis" includes all parts of the plant Cannabis Sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

(14) "Narcotic drugs" means coca leaves, opium, cannabis and every other substance neither chemically nor physically distinguishable from them . . .

Nowhere was cannabis or marijuana named as a dangerous drug under the dangerous drug act. RCW 69.40.060, 69.40.061. I do not see how the prosecuting attorney had an option to charge either a felony or a misdemeanor of the identical offense, *i.e.*, possession of marijuana as a felony or possession of marijuana as a misdemeanor. An information, therefore, laid under the Uniform Narcotic Drug Act charging one with possession of marijuana charged a felony, and could not sensibly be claimed to be a misdemeanor for, as the court points out, where there are both general and specific sections relating to the same or similar subject matter, the specific definition or designation is controlling.

To reach a conclusion that the Uniform Narcotic Drug Act and the dangerous drug act were duplicitous with respect to marijuana, the court makes certain assumptions which I find untenable. Its observations as to the medical

and chemical properties and psychological and emotional effects of marijuana I think not only scientifically questionable but beyond the judiciary's constitutional sphere. Whether marijuana was to be regarded as a narcotic drug or a dangerous drug or neither was a matter falling peculiarly within the legislative sphere of action and outside that of the courts. Thus, in assuming that marijuana cannot be lawfully defined by the legislature as a narcotic, the court, in my judgment, overstepped its constitutional limitations.

In a case of this kind, the judiciary should limit itself to ascertaining the legislative definition and applying it to the case at hand. Scientific judgments are more appropriately left to scientists, and definitions in the criminal law to the legislative branch. When these definitions do not meet the test of time, subsequent legislatures and latter-day scientists may change them. Contrarily, when the judiciary makes formal pronouncements as to the existence of one thing or another, there is always a danger that in the course of time these may turn out to be wrong and that which is declared fact today may amount to no more than fancy tomorrow.

If there exists in fact any reasonable basis whatever for it—however remote that may be—the legislature's definition is controlling. Here, however, the basis was not remote but immediate and appropriate because there existed a substantial, scientific basis in fact to treat marijuana legislatively as a narcotic. Medical classifications and definitions frequently overlap and coalesce. It is quite likely that many drugs generically described as narcotics are dangerous drugs, too, and that a good many of what are called dangerous drugs produce a variety of narcoses. Their physiological and psychological effects, of course, depend in some degree on the drugs' strength and concentrations and the individual characteristics of the persons taking them, and these variables may also condition their medical description and definition. For example, one classification of drugs known as hypnotics inhibits the afferent impulses, or cortical centers, of the brain, causing insensibility to pain and may produce

complete or partial unconsciousness. In other contexts, these drugs could logically be called narcotics for purposes of law.

Hypnotics include sedatives, analgesics, anesthetics and intoxicants. When used to induce sleep, they can be logically described as narcotics, or somnifacients or soporifics. Among the milder forms of hypnotics are sodium bromide, potassium bromide, ammonium bromide and aspirin; stronger ones include trional, veronal, chloral hydrate, chloralamide. Other hypnotics include such derivatives of barbituric acid as luminal (phenobarbital), barbital (veronal), dial, amytal, allonal, and many others—all of which are both narcotics and hypnotics. Also included among hypnotic drugs are the more classically styled narcotics such as opium and morphia and its derivatives. Although analgesics and anesthetics are defined as hypnotics, they are not generally considered to be narcotics. *See* Taber's Cyclopedic Medical Dictionary (9th ed. 1963).

Thus it is seen that medical definitions and classifications concerning narcotics include the drugs which produce sleep or stupor, or depress the central nervous system to relieve pain or induce sleep, but which, in excessive doses, will produce unconsciousness, stupor, coma and death. These classifications would necessarily include some drugs which meet the generic classification of dangerous drugs as well. More explicit examples of narcotics, however, are opium, morphine, codeine, papaverine, heroin and numerous synthetic drugs, and if the legislature chose to include marijuana among them it was, in my view, a legitimate legislative action.

Even the court's description of the multifarious effects of marijuana cited from D. Pet, M.D., and J. Ball, Ph.D., *Marihuana Smoking in the United States*, 32 Federal Probation 8 (No. 3, 1968), I think would warrant including marijuana among the narcotic drugs. Accordingly, it was well within the legislature's province as a matter of fact as well as of law to classify marijuana either as a narcotic drug or a dangerous drug or as neither.

When the legislature acted within its powers in defining and classifying drugs, medicines and pharmaceuticals in

both the Uniform Narcotic Drug Act and the dangerous drug act, there then devolved upon the courts an inescapable duty to sustain these definitions and classifications and enforce them. Such observations as the court makes that the use of marijuana does not lead to addiction; that its use can be discontinued without withdrawal symptoms; that the human body does not develop a tolerance to it; that some individuals become emotionally dependent upon it— the court does not differentiate between emotional dependency and addiction; or that marijuana in itself creates no problems of addiction, not only are open to doubt and question but do not, in my opinion, affect the legislative definitions so long as the legislature had a rational basis for concluding otherwise.

And there is abundant evidence that the legislature may have been right the first time and that the court's assumptions are in error. Whatever may be said of marijuana, common sense indicates that its physiological, emotional and psychological effects upon the human system undoubtedly depend upon the length of time it is used, how it is used, the particular species used, its strength or concentration, the amount and intervals taken, and the differing reactions of different individuals to it. The legislature was, therefore, well within its powers in defining marijuana as a narcotic drug and later in redefining it as a dangerous drug, for it could appropriately be classified either way for purposes of law.

The legislature and not the courts decides what punishment shall fit which particular crime. It may well be that, when it described marijuana as a narcotic instead of as a dangerous drug, it was aiming at the evil of heroin, LSD, opium, morphine, cocaine and other hard narcotics, and a majority of the legislators held to the belief that criminals who sold marijuana in all likelihood pushed the sale of other drugs, too. Contrarily, in changing the definition of marijuana from a narcotic to a dangerous drug and thereby reducing the penalty for the first offense of possessing marijuana, a majority of the legislature may well have concluded that there is little or no connection between the sale

and possession of marijuana and the sale and possession of heroin, opium, morphine or cocaine. Time is long and ideas change. A future legislature may feel obliged to increase the penalties to meet ever-changing needs and conditions. It should have the same freedom and power as its predecessors. Whatever the actual basis for change, the power to make it rests in the legislature and not the courts.

I do agree with the majority, however, that, in employing the imprecise phraseology of the proviso "That narcotic drugs shall not include cannabis and the provisions of this chapter shall not ever be applicable to any form of cannabis," the legislature in Laws of 1969, 1st Ex. Ses., ch. 256, § 7, p. 2385, amending RCW 69.33.220, must have intended to make the amendment and consequent reduced penalty for possession of marijuana retroactive. This seems to be the most sensible construction available.

I would, therefore, as the majority has done, reverse with directions that the defendants be brought to a new trial on the charge of illegal possession of marijuana under the dangerous drug act (RCW 69.40) as amended.

NEILL, J., concurs with HALE, J.

September 16, 1970. Petition for rehearing denied.