STATE OF HAWAII, Plaintiff-Appellee *v.* PAUL LORIN KANTNER, Defendant-Appellant

No. 4995

*and*

In re Application of DAVID ALLEN NOWELL and CLAUDE ERNEST WINTER, Petitioners-Appellants, for Writ of Habeas Corpus, etc.

No. 5005

January 20, 1972

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON and KOBAYASHI, JJ.

OPINION OF RICHARDSON, C. J., IN WHICH MARUMOTO,
J., JOINS, ANNOUNCING THE JUDGMENT OF THE COURT

The sole issue presented in this consolidated appeal is the constitutionality of the statutory scheme for the control of the possession of marihuana. HRS § 329-5, as amended by Act 161, S.L.H. 1969, which served as the basis of parole revocation of petitioners Nowell and Winter and upon which defendant Kantner was convicted, provides as follows:

> *Additional acts prohibited; penalty.* No person shall knowingly . . . possess . . . any narcotic drug as defined by section 329-1 except as provided in this chapter. . . .

Under HRS § 329-1 the term "narcotic drug" is defined as follows:

> 'Narcotic drugs' mean any of the following . . .
>
> (5) Marihuana. Marihuana includes the following substances under whatever names they may designate: all parts of the plant cannabis sativa, L., whether growing or not, the seeds thereof, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or resin, but, shall not include the sterilized seed of the plant which is incapable of germination.

Appellants concede that the State may properly regulate the possession of marihuana under the police power. The thrust of appellants' argument is that the State has so unrea-

sonably and irrationally exercised its police power that the present statutory scheme for the prohibition of possession of marihuana violates the constitutional guarantees of equal protection and due process of law. Uncontroverted evidence showed that in some respects marihuana was unlike the opiates and other drugs within the scientific definition of the word "narcotic". The evidence, however, tended to show that marihuana has many of the properties of a narcotic, scientifically defined.[1]

Proceeding from the proposition that marihuana is not a narcotic scientifically defined, appellants contend that the defining of the term narcotic so as to include marihuana and the inclusion of marihuana within the same class as the more harmful narcotic drugs is so unreasonable and arbitrary as to violate the constitutional guarantees of equal protection and due process of law.

The legislature has a broad power to define terms for a particular legislative purpose, and the courts, as a general rule of construction, are bound to follow legislative definitions of terms rather than commonly accepted dictionary, judicial or scientific definitions. *Bailey's Bakery, Ltd. v. Borthwick*, 38 Haw. 16 (1948); *Akai v. Lewis*, 37 Haw. 374 (1946); *Hawaii Consolidated Ry. v. Borthwick*, 34 Haw. 269 (1937). We think the requirements of due process place some limitation on the manner in which a legislature may use words. If we believed that the use of the word narcotic to include marihuana were so misleading as to confuse

---

[1]The evidence tended to show that narcotic drugs have the property of relieving pain in small doses, produce stupor and invoke sleep in higher doses and eventually cause death by respiratory paralysis. Except for the ability to cause death through respiratory paralysis, these properties of narcotic drugs are properties shared with marihuana. The phenomenon of "tolerance", whereby the user is required to take, over a period of time, increasingly larger doses in order to achieve the same initial effect and the phenomenon of "physiological dependence," whereby the symptoms of salivation, nausea, convulsions and extreme pain accompany the withdrawal of the drug to the user, were shown to be properties of narcotics, scientifically defined, but not properties of marihuana.

legislators in their law-making activities[2] or to confuse persons of common understanding in their effort to determine whether the possession of marihuana constitutes a crime, it would clearly be our duty to declare the unconstitutionality of the statute. Inasmuch as the word "narcotic" in popular usage includes marihuana, it is no violation of the guarantee of due process of law for the legislature to employ such usage over the more precise usage favored by the scientific community. *Cf., Territory v. Tam,* 36 Haw. 32, 37 (1942).

We think that appellants' contentions concerning the legislative classification of marihuana are untenable. Appellants contend that the legislature has placed the offenses of possession of marihuana and the possession of narcotics, scientifically defined, within the same legislative classification. We disagree; the legislature has provided for markedly different penalties for possession of marihuana as opposed to narcotics, scientifically defined.[3] Certain offenses involving marihuana are treated the same as the corresponding offense involving a narcotic scientifically defined, for example,

---

[2]The proposition that legislation be enacted in a form not misleading to the legislators is contained in Article III, section 15 of the Hawaii Constitution, which provides in part: "Each law shall embrace but one subject, which shall be expressed in the title." In re Goddard, 35 Haw. 203, 207 (1939), decided under the Organic Act, indicated that the purpose of the "one subject expressed in the title rule" was:

. . . [F]irst, to prevent hodgepodge or "logrolling" legislation; *second,* to prevent surprise or fraud upon the legislature by means of provisions in the bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and *third,* to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have the opportunity of being heard thereon, by petition or otherwise, if they shall so desire.

[3]HRS § 329-5, as amended, Act 161, S.L.H. 1969, provides that for the first and subsequent offenses, one who is found guilty of possession of marihuana is subject to imprisonment "for not more than one year, or for not less than one year nor more than five years." Persons found guilty of the possession of drugs defined as narcotic drugs in HRS § 329-1, other than marihuana, are subject to imprisonment of "not more than five years for the first offense" and "not more than ten years for any subsequent offense."

the cultivation, production or manufacture of the drug. These offenses, however, are not before us and under the doctrine of *State v. Grahovac*, 52 Haw. 527, 480 P.2d 148 (1971), we decline to consider these related offenses. Were we to consider the supposed constitutional problem involving the inclusion of marihuana offenses within the same classification as offenses involving narcotics scientifically defined, we would find the following language of the Massachusetts Supreme Judicial Court most persuasive:

> . . . All of these substances [marihuana and the narcotics scientifically defined] are "mind-altering" drugs. The fact that some are more potent or more dangerous than others does not render the classification arbitrary. To some degree they are all capable of producing psychotic disorders, states of intoxication and psychological dependency, and consequently present some danger to the health and safety of the community. We do not think that the classification of marihuana with the others is arbitrary or irrational. *Commonwealth v. Leis*, 355 Mass. 189, 197, 243 N.E.2d 898, 905 (1969).

Appellants' main contention concerning classification is the argument that the properties of the drugs alcohol and marihuana are so similar that a provision for a penalty for the possession of marihuana in a case where there is none made for possession of alcohol violates the constitutional guarantee of the equal protection of the laws. The issue then is not whether marihuana is more like alcohol than heroin but whether there are sufficient dissimilarities between alcohol and marihuana to support different legislative treatments. We think alcohol and marihuana are sufficiently dissimilar to justify dissimilar legislative treatment. Alcohol is a drug about which much is known concerning the long-term effect on the human body; of marihuana, much less is known. On that basis alone, treatment dissimilar to that given alcohol is justified, at least until scientific research conclusively establishes the long-term effects of the drug marihuana. Since it is presumed that statutes are constitutional, *Bishop*

*Trust Co. v. Burns,* 46 Haw. 375, 381 P.2d 687 (1963); *McKenzie v. Wilson,* 31 Haw. 216 (1930); *Territory v. Armstrong,* 28 Haw. 88 (1924) and since the party attacking the statute must show with convincing clarity that the statute is unconstitutional, *Hasegawa v. Maui Pineapple Co.,* 52 Haw. 327, 475 P.2d 679 (1970); *Koike v. Board of Water Supply,* 44 Haw. 100, 352 P.2d 835 (1960), the absence of sound scientific data concerning the long-term effects of marihuana renders appellants' burden insurmountable.

Appellants argue that Hawaii's original narcotics legislation was enacted in 1931, during a period of American history in which public attitude toward marihuana was largely colored by false and unsubstantiated claims concerning the dangers of marihuana. Accordingly, appellants argue, the statute must fall in light of present knowledge concerning marihuana. While we concede that evidence tends to show a less than enlightened public understanding concerning the nature of the dangers of marihuana during the period in question, we cannot accept appellants' contention. There has been no showing that a general nation-wide hysteria over the marihuana question did in fact induce the 1931 Territorial Legislature to act.[4] Assuming such a connection could be established, it would mean very little.[5] Assuming arguendo that the legislature did act on the basis of fear-induced hysteria, the party attacking a statute would not be relieved from the burden of clearly showing that no rational factual basis exists to support the statute.

With respect to appellants' argument that the use of marihuana involves an issue of "fundamental liberty" and, hence, a different standard of review should be applied to

---

[4]The original enactment of a narcotic law was Act. 152, S.L.H. 1931, predating the height of the alleged general nation-wide marihuana hysteria by several years. Until Act 228, S.L.H. 1959, marihuana was treated separately from the narcotics, scientifically defined, and was not included in the legislative definition of narcotic drugs.

[5]"We know of nothing that *compels* the Legislature to thoroughly investigate the available scientific and medical evidence when enacting a law." Commonwealth v. Leis, *supra,* 355 Mass. 189, 192, 243 N.E.2d 898, 901-2 (1969).

the statute, we do not think that appellants have established that the interest of the individual in possessing and using marihuana is within the class of interests to which the state and federal constitutions accord the highest degree of protection. We recognize that there is limited authority for the proposition that the use of peyote, another mind-altering drug, may be protected in limited circumstance as a valid exercise of native American Indian religion. *People v. Woody*, 61 Cal. 2d 716, 394 P.2d 813, 40 Cal. Rptr. 69 (1964); *contra, State v. Big Sheep*, 75 Mont. 219, 243 P. 1067 (1926); *Oliver v. Udall*, 306 F.2d 819, *cert. denied*, 372 U.S. 908 (1962). We doubt, however, that use of a mind-altering drug, absent an intimate connection with a "preferred freedom", requires the standard of review which appellants suggest. Our reading of *Griswold v. Connecticut*, 381 U.S. 479 (1965) leads us to conclude, as did the court in *People v. Aguiar*, 257 Cal. App.2d 597, 65 Cal. Rptr. 171, *cert. denied*, 393 U.S. 970 (1968) that there is no fundamental guarantee protecting the use and possession of euphoric drugs. We decline, as did the Supreme Court in *Griswold, supra*, 381 U.S. at 481-82 to accept the invitation of *Lochner v. New York*, 198 U.S. 45 (1905) to "sit as a super-legislature to determine the wisdom, need and propriety of laws that touch economic problems, business affairs, or social conditions." As we read *Griswold, supra*, the test of whether an activity may be considered to rest under the "penumbra" of a preferred freedom is that the activity in question must be essential, not merely desirable, for the exercise of the specifically enumerated rights.[6]

---

[6]We are led to this reading of the test laid down in Griswold, *supra*, by the Court's characterization of its methodology at 381 U.S. at 481-83. There the Court suggests that the result in Griswold, *supra*, is simply a logical extension of Pierce v. Society of Sisters, 268 U.S. 510 (1925) and Meyer v. Nebraska, 262 U.S. 390 (1923). The Court uses Pierce, *supra*, and Meyer, *supra*, and related cases to show a pattern of penumbral First Amendment freedom of speech analysis. According to the Court's Griswold opinion, 381 U.S. at 482, the following pattern is discernible:

By *Pierce* v. *Society of Sisters, supra*, the right to educate one's children

Affirmed.

*Hyman M. Greenstein* for appellants.

*Michael Weight*, Deputy Prosecuting Attorney (*Barry Chung*, Prosecuting Attorney with him on the brief) *and*

*Thomas M. Pico, Jr.*, Deputy Attorney General (*Bertram T. Kanbara*, Attorney General, and *Morton King*, Senior Deputy Attorney General, with him on the brief) for appellees.

## CONCURRING OPINION OF ABE, J.

It is conceded by the appellants that the regulation of the use of marijuana is a reasonable and legitimate exercise of the police power of this State. However, they contend that the inclusion of marijuana in the narcotic drug statute, HRS Ch. 329, is unreasonable and violates the Due Process Clauses of the United States Constitution and the Hawaii State Constitution. The appellants presented this question as the sole issue on appeal.

## I.

Appellants contend that marijuana does not have the

---

as one chooses is made applicable to the States by the force of the First and Fourteenth Amendments. By *Meyer* v. *Nebraska, supra,* the same dignity is given the right to study the German language in a private school. In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (*Martin* v. *Struthers,* 319 U.S. 141, 143) and freedom of inquiry, freedom of thought, and freedom to teach (*see Wieman* v. *Updegraff,* 344 U.S. 183, 195) — indeed the freedom of the entire university community. *Sweezy* v. *New Hampshire,* 354 U.S. 234, 249-50, 261-63; *Barenblatt* v. *United States,* 360 U.S. 109, 112; *Baggett* v. *Bullitt,* 377 U.S. 360, 369.

The reason that the above cited activities must fall under the protection of the First Amendment is that "[w]ithout those peripheral rights the specific rights would be less secure." 381 U.S. at 482-83. In light of the Court's warning to eschew the substantive due process approach of Lochner v. New York, *supra,* we think the test of a penumbral constitutional right must be restricted to that which is essential to the continued viability of the specifically enumerated rights. Otherwise the test becomes one not of law, but of the personal whim and predeliction of the judge.

common attributes present in narcotics and does not come within the scientific definition of "narcotics," and that, therefore, the classification of marijuana with narcotics is irrational and unreasonable and violates the due process guaranty. On the other hand the State contends that once the statute defines marijuana among narcotic drugs, it is immaterial that the statutory definition is not identical to the scientific definition.

The two expert witnesses who testified defined marijuana to be a drug and I have no doubt that marijuana may be classified as a drug.

Judging from articles written by experts on the subject of marijuana it appears that it has certain characteristics of narcotics. Dr. Casarett, who was called by the appellants as well as the appellee, testified that cocaine, opium, morphine, and marijuana all can be classified as euphotic, and as stimulants and intoxicants. He also testified that "a narcotic compound is, in its strictest definition, * * * one which stupefies, depresses the central nervous system, tends to produce sleep, these are often taken as synonymous entities." In his testimony he stated, contrary to the appellants' contention, that the definition of a narcotic did not include the capacity to produce a tolerance or physical addiction. However, he also stated that in his opinion tolerance can be developed to marijuana and that this opinion is supported by the current pharmacological and medical writers. This tolerance he stated is more properly defined as a "drug dependence," and is basically a psychic dependence. He then concluded that the physiology of the dependence is more or less irrelevant, and that marijuana is an addicting drug in an over-all sense.

However, whether or not marijuana is technically a "narcotic" is irrelevant. I agree with Chief Justice Richardson's statement that:

"The legislature has a broad power to define terms for a particular legislative purpose, and the courts, as a general rule of construction, are bound to follow legis-

lative definitions of terms rather than commonly accepted dictionary, judicial or scientific definitions. * * * Inasmuch as the word 'narcotic' in popular usage includes marihuana, it is no violation of the guarantee of due process of law for the legislature to employ such usage over the more precise usage favored by the scientific community. * * *"

I believe that the more interesting and pertinent issue raised by the Due Process and Equal Protection Clauses is not whether marijuana is a "narcotic," but whether marijuana is, like narcotics, sufficiently harmful to the general welfare that the possession of marijuana may be prohibited in the same way possession of the narcotics is prohibited. However, the only argument made by the appellants is that marijuana is not technically a "narcotic," and cannot be included in a statutory scheme with true narcotics. Thus, it is unnecessary to reach other issues raised by the Equal Protection Clause and the Due Process Clause. However, inasmuch as other justices today have reached some of those issues, I will briefly outline my thoughts.

## II.

I do not agree with Chief Justice Richardson that one does not enjoy the fundamental constitutional right to smoke marijuana. I stated in the dissent in *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970), that I believed that under Art. I, Sec. 2 of the Hawaii State Constitution[1] one has a fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the gen-

---

[1]Art. I, Sec. 2 of the Hawaii State Constitution reads:

"All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities."

eral welfare—that is, where others are harmed or likely to be harmed. Thus, I believe that the right to the "enjoyment of life, liberty and the pursuit of happiness" includes smoking of marijuana, and one's right to smoke marijuana may not be prohibited or curtailed unless such smoking affects the general welfare.

I have read numerous articles on marijuana and I believe that I gained some knowledge on the subject, however, I consider myself far from being an expert. Truthfully, I cannot say whether those who claim that the use of marijuana is harmful are correct or those who take the opposite view are correct.

It would appear that Professor John Kaplan has adopted an objective view when he says:

"[T]oday, the allegations are not that long-term marijuana use causes mental illness but rather that it causes another type of mental deterioration—brain damage. Primary reliance again is placed upon foreign studies, but these suffer from great methodological difficulties and, in fact, seem to agree that moderate use of the drug is not harmful. The most reliable foreign study, that of the Indian Hemp Drugs Commission, as well as recent studies in the United States, indicate the long-range effects of most marijuana use are not serious. The effects of long-term heavy use of marijuana are in great part not known. A major reason for this is that the methodological difficulties in the studies that purport to find serious damage are so significant that one simply cannot tell. In addition, the problem of determining the long-range mental harm due to any substance is an extremely difficult one.

\*         \*         \*         \*         \*

"On the other hand, medical groups that have denounced marijuana as a dangerous drug are not completely wrong. To some extent, of course, the drug *is* dangerous." Kaplan, *Marijuana, The New Prohibition,* pp. 193-94.

He then says, at pages 314-15:

"In the case of marijuana, just as in the case of alcohol or tobacco, no matter what means of control is attempted, there will be those who will use the drug to their own and to society's detriment. The dangers of marijuana may have been grossly exaggerated, but as shown in Chapter V, they are far from negligible—especially for the very young. And although the total number affected seriously may still not be very impressive compared to the magnitude of other public-health problems, there is no reason why we should not strive to keep it as low as practicable.

       *        *        *        *        *

"It would seem clear, therefore, that we should treat marijuana considerably more respectfully than we do sugar candy. * * *""

Judging from the multitude of writings, there is considerable controversy on the issue whether marijuana is or is not harmful. Also it was testified that using the analogy of an iceberg only 5 percent is known about marijuana and its effects and therefore can be considered above water, and 95 percent is unknown or under water. On the other hand, on the subject of alcohol and tobacco and their effects 90 percent is known or above water.

Of course, in my opinion, the finding that marijuana is harmful to the user does not authorize the State under its police power to prohibit its use under threat of punishment. Under the doctrine I stated in the dissent in *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970), the State must prove that the use of marijuana is not only harmful to the user but also to the general public before it can prohibit its use. However, the appellants have conceded both in the trial court and on appeal that the State may regulate the use of marijuana under its police power. Thus, under the record of this case the State was not required to prove this point. It would be unreasonable for this court therefore to hold that, in spite of this concession in the proceedings, the State should have met

its burden of proof on this point.

Therefore, under the record of this case, I am compelled to affirm the judgment of the trial court.

### DISSENTING OPINION OF LEVINSON, J.

I dissent.

The crucial issue in this case is whether a person has a constitutionally protected right purposely to induce in himself, in private, a mild hallucinatory mental condition through the use of marihuana. I believe that there is such a right and that it is founded upon the constitutional rights to personal autonomy and privacy, guaranteed by article I, sections 2 and 5 of the Hawaii Constitution as well as by the due process clause of the fourteenth amendment of the Federal Constitution. I believe that HRS § 329-5 (Supp. 1971) violates both constitutions because it unreasonably infringes upon these rights and, therefore, I would reverse.

### I. THE RIGHT TO BE LET ALONE AND ITS RELATION TO THE PRIVATE, PERSONAL USE OF MARIHUANA.

In our system of law the personal autonomy and privacy of individuals is afforded the highest consideration. The very concept of limited government evinces a desire to free persons from the unbounded control of the State, in order that they may most productively pursue their own life goals. Perhaps the best articulation of the values inherent in American constitutional law was given by Mr. Justice Brandeis in his now famous dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 478 (1928), quoted with approval in *Stanley v. Georgia*, 394 U.S. 557, 564 (1969):

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure, and satisfactions of life are to

be found in material things. They sought to protect Americans in their *beliefs,* their *thoughts,* their *emotions* and their *sensations.* They conferred, as against the Government, *the right to be let alone*—the most comprehensive of rights and the right most valued by civilized men. (emphasis added)

This right to personal autonomy lies at the heart of our system of government. Some of its component ideas find expression in the constitutional guarantees of free speech, press, assembly, religion[1] and freedom from unreasonable searches and seizures.[2] These guarantees uphold the dignity of the individual and protect his right to develop in accordance with the inward forces which make him a unique human being. As important as these enumerated rights are, however, it would be grave error to hold that they exhaust the limits on the power of government to invade the individual's right to freedom of thought and action. The framers of the United States Constitution recognized that individual freedom is not susceptible to full definition by verbal enunciation and thus warned in the ninth amendment:

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.[3]

Mr. Justice Goldberg in his concurring opinion in *Griswold v. Connecticut,* 381 U.S. 479, 494 (1965), expressed the belief that this amendment afforded proof that due process of law encompasses a fundamental personal right of privacy. *Accord State v. Abellano,* 50 Haw. 384, 386, 441 P.2d 333, 335 (1968) (concurring opinion of Levinson, J.). In Hawaii there can now be no doubt that the right of privacy

---

[1]Article I, section 3 of the Hawaii Constitution and the first amendment of the United States Constitution.

[2]Article I, section 5 of the Hawaii Constitution and the fourth amendment of the United States Constitution.

[3]Article I, section 20 of the Hawaii Constitution contains a similar rule of construction.

exists as a basic safeguard of individual liberty since it has been given substantive expression in article I, section 5 of the State Constitution.[4]

---

[4]Article I, section 5 provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures, and *invasions of privacy* shall not be violated; . . . (emphasis added).

The term "invasions of privacy" was added in the 1968 Constitutional Convention whose Standing Committee Report No. 55 in explaining it and urging its adoption said that it "will effectively protect the individual's wishes for privacy as a legitimate social interest. The proposed amendment is intended to include protection against indiscriminate wire-tapping as well as undue government inquiry into and regulation of those areas of a person's life which is defined as necessary to insure 'man's individuality and human dignity.'" The debates in the Convention's Committee of the Whole on September 10, 1968, relating to the amendment include the following explanation by Delegate Larson:

Mr. Chairman, the right of privacy has been defined in many ways. Mr. Justice Clark called it the right to be let alone, to live one's life as one chooses, free from assault, intrusion or invasion except as they can be justified by the clear needs of community living, under a government of law. Privacy has also been defined as a right to be let alone, the right of personality or man's individuality and human dignity.

. . . I feel that each of us has his own definition of the so-termed "right of privacy" which is meaningful to himself. . . . Personally, there are several main reasons why I feel such an addition of the right of privacy to this section would be worthwhile for inclusion in our Constitution.

. . . .

Another area which has been under consideration in modern times is that of marital privacy. To what extent is government to be allowed into the intimacy of such a relationship, whether by regulating contraceptive devices or by specifying what can and what cannot be engaged in, in the intimacies of one's bedroom.

. . . I feel the inclusion of such a right of privacy would be reflective of our times. The idea of right is an evolving concept constantly changing with the times. To the delegates of the 1950 Convention, it was important that we would not disqualify a juror because of sex or discriminate against persons in military enlistment. As some guarantees . . . become obsolete or archaic, others become important. A Bill of Rights should not only mirror ages past but should also recognize up to date demands upon human rationality and society. . . .

. . . I feel that the right of privacy is indeed one mark of freedom or democracy in our times. One of the great differences between countries which are called totalitarian or dictatorial and those which are called democratic or swingy is that of respect for the individual, in appreciation of the individual's right insofar as possible to live his life without undue interference on the part of the state or of the government.

This constitutional right to privacy encompasses more than just freedom from government surveillance. It guarantees to the individual the full measure of control over his own personality consistent with the security of himself and others. This freedom to choose one's own plan of life is essential to the pursuit of happiness and the enjoyment of life and thus finds additional protection in article I, section 2 of the Hawaii Constitution.[5] *See State v. Shigematsu,* 52 Haw. 604, 610, 483 P.2d 997, 1000 (1971). In the instant case, the State's infringement upon this right of personal autonomy becomes apparent when one understands the nature of marihuana and the reasons for its use.

It is now universally recognized by modern authorities on the subject that marihuana is not a drug of addiction; that is, unlike narcotic drugs, marihuana does not produce physical dependence in the user which compels its continued use. L. GRINSPOON, M.D., MARIHUANA RECONSIDERED 233 (1971).[6] The individual who uses marihuana does so from choice, in the pursuit of various goals which may include the relief from tension, the heightening of perceptions, and the desire for personal and spiritual insights. L. GRINSPOON, M.D., *supra* at 176; J. KAPLAN, MARIJUANA— THE NEW PROHIBITION 73-74 (1970); M. Town, *"Privacy and the Marijuana Laws,"* reprinted in THE NEW SOCIAL DRUG 129-30 (1970); Watts, *Psychedelics and Religious Experience,* 56 Calif. L. Rev. 74, 76-79 (1968). In short, marihuana produces experiences affecting the thoughts, emotions and sensations of the user. These experiences being mental in nature are thus among the most personal and pri-

---

[5]Article I, section 2 provides:

All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities.

[6]Dr. Lester Grinspoon is Associate Clinical Professor of Psychiatry at the Harvard Medical School and Director of Psychiatry (Research) at the Massachusetts Mental Health Center.

vate experiences possible. For this reason I believe that the right to be let alone protects the individual in private conduct which is designed to affect these areas of his personality, so long as such conduct does not produce detrimental results.

This principle that the State's power to restrain private conduct is limited by the need to show social injury was recognized by this court in *State v. Lee,* 51 Haw. 516, 521, 465 P.2d 573, 577 (1970):

[W]here an individual's conduct, or a class of individuals' conduct, does not directly harm others the public interest is not affected and is not properly the subject of the police power of the legislature.

In the *Lee* case, the court went on to announce a narrow exception to the above general rule. The State may also act to protect a large class of individuals from harm to themselves, but only where such harm has been compellingly demonstrated to the satisfaction of the court. *State v. Lee, supra.* Because the State has failed to establish that the private, personal use of marihuana harms either the user or society, I would hold that the prohibition of HRS § 329-5 (Supp. 1971) unreasonably infringes upon the appellants' rights to personal autonomy.

## II. THE EVIDENCE OF SOCIAL HARM IS INSUFFICIENT TO JUSTIFY MAKING THE MERE PRIVATE POSSESSION OF MARIHUANA A CRIME.

The State puts forth two main arguments as justification for prohibiting personal possession of marihuana. Primary reliance is placed on the contentions that marihuana is psychologically and physically harmful to the user. These contentions, however, are disputed by the State's own expert witnesses, who were called to testify in the trial below on the toxic nature of marihuana.

When asked on direct examination whether in the course of his parctice he had personally observed any adverse ef-

fects from the use of marihuana, Dr. Fred Weaver, Chief Psychiatrist for the Adolescent Unit of the Hawaii State Hospital, Kaneohe, answered: "No, I haven't, that I could attribute to the use of marihuana." Dr. Weaver did testify that some large users exhibited the development of the so-called "amotivational syndrome," which he described as a passive state where the affected individual loses interest in things that are traditionally important to the "older generation." Nevertheless, this effect cannot serve as a valid basis for legislation. A society which cherishes individual freedom may not justify regulations solely on the need to maintain the existing order of moral, economic and social values.

The State's other expert witness also failed to substantiate the claim that marihuana is harmful to the user. Dr. Louis J. Casarett, Professor of Pharmacology at the University of Hawaii, when asked on cross-examination whether he considered marihuana to be a dangerous drug answered in the negative[7] and, on further questioning, stated that he did not know of a single documented case of death due to the smoking of marihuana. By contrast, Dr. Casarett did testify that he considered aspirin to be a dangerous drug, which caused a certain number of fatalities among its users.

This testimony substantiates the opinion of other scholars in the field of marihuana use that harm to the user is not a conclusive fact, but speculative or a slight risk at best. L. GRINSPOON, supra at 347. Under the standard laid down in State v. Lee, supra, mere speculation cannot form a valid basis for the government's use of its police power to protect a person from his own actions. Therefore,

---

[7]On direct examination Dr. Casarett did testify that one of the active ingredients in marihuana, tetrahydrocannabinol (THC) could be considered a dangerous material because it might produce aberrant behavior in a fraction of its users. Subsequently, Dr. Casarett clarified this testimony by stating that this opinion was related to the use of the drug THC, rather than to the smoking of marihuana as such.

this ground is insufficient to justify the State's intrusion into the privacy of the appellants.

The State also argues that the use of marihuana may contribute to the commission of crimes and that, therefore, personal possession of the drug is lawfully prohibited. Again the evidence in this area appears to be highly speculative. The State relies upon studies conducted in India, Latin America and Greece, which may not be readily transferrable to the United States because of the differing economic and social conditions.[8] On the other hand, studies which have been conducted in the United States, such as the La Guardia Study, conclude that marihuana is not a determining factor in the commission of crimes. L. GRINSPOON, *supra* at 308-11. Given this present degree of knowledge, I would concur in the principle expressed by the United States Supreme Court in *Stanley v. Georgia,* 394 U.S. 557, 566-67 (1969), which held that the mere private possession of obscene materials cannot constitutionally be made a crime:

> [I]f the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that "[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law . . . ."

Thus, I would hold that the State has failed to demonstrate sufficient justification for its intrusion into the privacy of the individual with respect to the personal use of marihuana. The State cannot prevail except under the test described by Mr. Justice Goldberg in his concurring opinion in *Griswold v. Connecticut,* 381 U.S. 479, 497 (1965):

> In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing

---

[8]See *J. Kaplan, Marijuana — The New Prohibition* 98-136 (1970) for a critique of the reliability of these and other studies linking marihuana use and antisocial behavior.

that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling," *Bates v. Little Rock,* 361 U.S. 516, 524. The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin v. Florida,* 379 U.S. 184, 196. See *Schneider v. Irvington,* 308 U.S. 147, 161.

In his concurring opinion, my Brother Abe recognizes that the State would ordinarily bear the burden of proving that the use of marihuana is harmful to the general public in order to justify prohibiting its use through the exercise of the police power. He argues, however, that since the appellants conceded that the State may regulate the use of marihuana, the State was relieved of its obligation to prove social harm. Apparently, he believes that the issue of the State's power to prohibit was not controverted, and that, therefore, the State was not put on notice that it had to prove social harm as part of its case.

The record, however, belies this argument. The appellants specifically distinguished in their brief between the State's power to regulate the use of marihuana (as in the case of such substances as alcohol and tobacco) and its power to prohibit altogether. Regulation and prohibition are not coextensive. Furthermore, the State's presentation in the circuit court was replete with attempts to prove a nexus between the use of marihuana and harm to the user as well as a propensity toward anti-social behavior and the commission of crime. The circuit court repeatedly refused to limit the controversy to the reasonableness of the classification of marihuana as a narcotic. The suggestion that the State was relieved of its obligation to establish social harm is unrealistic.

I wish to make it clear that the views expressed in this opinion apply only to the private conduct of individuals. The

vice of the present statute springs from the license it gives to the State to violate a person's reasonable expectation of privacy. Where conduct is public in nature, however, society has a greater claim to the right of control and the State need not show as compelling an interest in its prohibition. Moreover, this analysis is not meant to imply a right to the personal use of other prohibited drugs, such as heroin and other narcotics, which are not involved in this case.

Finally, it should be stressed that the analysis I have adopted does not seek to establish this court as a super-legislature, exercising veto power over the wisdom and value of legislative policies. *See Griswold v. Connecticut, supra* at 512 (Justice Black's dissenting opinion). Any criticism which attempts to deter courts from inquiring into the constitutionality of laws must distinguish between legislation which seeks to regulate economic and social relationships and that which intrudes into the purely private sphere of human life. In the former instance courts rightfully grant the legislature wide latitude for experimentation in the promotion of the general good. But, where the State endeavors to intrude into the individual's private life and regulate conduct having no public significance, it is the duty of the courts to offer a haven of refuge where the individual may secure vindication of his right to be let alone.

### DISSENTING OPINION OF KOBAYASHI, J.

Just as it is a valid exercise of the State of Hawaii's police-power to regulate the sale, use, and possession of such commodities as alcohol and tobacco, it is axiomatic that the regulation of marijuana is also a valid state activity. I feel, however, that our present method of regulating marijuana—inclusion of marijuana within the classification of criminally proscribed narcotics—is unreasonable and unconstitutional in violation of the due process and equal protection clauses of the Fourteenth Amendment.

We have in the past in reviewing statutory classifica-

tions recognized that "it is the duty of this court to see that the legislature does not seek to achieve noble ends by unconstitutionally arbitrary means". *Hasegawa v. Maui Pineapple Co.*, 52 Haw. 327, 331, 475 P.2d 679, 682 (1970). Even if I felt that the legislature's present treatment of marijuana achieved a noble end, which I do not, HRS § 329-5, which proscribes the use of narcotics and classifies marijuana as a narcotic, must be regarded as an unconstitutionally arbitrary legislative declaration tantamount to an abuse of the state's police-power.

The equal protection clause has been construed by the U.S. Supreme Court so as to require that criminal statutory classification schemes cover all persons or things related to each other reasonably, logically or scientifically where their inclusion in the classification is necessary to effectuate the legislative purposes of the statute. *McLaughlin v. Florida*, 379 U.S. 184 (1964); *Skinner v. Oklahoma*, 316 U.S. 535 (1942). The Supreme Court of Washington, citing *Skinner* in construing Washington's narcotic statute, said that "[i]t is doubtful whether a legislative declaration contrary to all the evidence can be sustained as constitutional, if its effect is to deny a defendant equal treatment under the law." *State v. Zornes*, 78 Wash.2d 9, 20, 475 P.2d 109, 116 (1970). There has been shown no valid rational basis for including marijuana within the narcotic statute. Nor are there reasonably logical or scientific grounds for such a classification. On the contrary, the rationale for not including marijuana within HRS § 329-5 far outweighs the traditional arguments that support its continued inclusion.

Presumptively the statutory purpose sought to be attained by including marijuana within the classification of proscribed narcotic drugs stems from the following reasons: 1) that marijuana's use is per se harmful to the user, 2) that the use of marijuana is a stepping-stone to more serious drugs, 3) that the effects of consuming marijuana are sufficiently related to the effects of consuming narcotics, 4) that the use of marijuana leads to criminal ac-

tivity. These postulations have simply not been borne out. The findings from the evidence adduced indicate that none of the above rationale bears a reasonable relation to the inclusion of marijuana within the narcotic classification.

The Washington court in *Zornes, supra,* cites an article appearing in an official publication of the federal courts as describing the effects of marijuana:

Acute physical symptoms frequently include conjunctival vascular injection, dryness of the mouth and pharynx, irritation of the throat, increased sensitivity to light, sound, touch, and pain stimuli, and such changes in the autonomic nervous system as increase in pulse, blood pressure, and tendon reflexes. Ataxia, the impaired ability to coordinate voluntary muscular movements, may also occur. Appetite is often stimulated. There is no evidence that marihuana increases sexual potency. There are as yet no recognized lasting ill effects directly attributed to the brief use of marihuana nor has a death been reported in this country due to over-dosage.

The mental changes following marihuana use are variable and depend in part upon the expectations and prior drug experience of the user and the social setting at the time of use; thus, the meaning of the experience is largely socially acquired. *Marihuana is primarily classified as a hallucinogen even though intoxication may include both early stimulant and later depressant effects.* A decreased sense of fatigue, relaxation, and increased self-confidence has been described. There may be a distortion of affect toward omnipotency and a perception of "insight" rarely shared by the unintoxicated. The individual is often garrulous, giggly, and talk is disconnected. Associated with a period of euphoria, or well-being, there may be distortions of time, space, color, and other sensory perception with increased dosage.

Depersonalization, the perception of the physical body as not self, has been described with use. While this distortion might be expected to increase the likelihood of

self-injury, we know of no documentation to confirm this expectation.

Increased suggestibility, decreased judgment, and change of affect may be followed by depression and sleep. There may also be delusions, hallucinations, suspiciousness, panic, and fear of death. Violent or aggressive behavior is unusual. While occasional persons may be especially sensitive to even small doses, with the result that a psychotic-like state is produced, there is recent evidence that almost all persons are so affected with sufficient dosage. A puzzling observance is that many of the persons who have had frightening episodes in their marihuana experience wish to repeat it.

In summary, the acute effects of marihuana smoking commonly include a euphoric state accompanied by motor excitation and mental confusion. These reactions are often followed by a period of dreaminess, depression, and sleep. The wide variety of individual reactions appears to be more closely related to personality differences (including expectations and emotional arousal) and the cultural setting of use than to any specific property of the drug itself. Recognizing this variability, one user remarked that "every person has the dream he deserves." (Italics ours.) (Footnotes omitted.) D. Pet, M.D., and J. Ball, Ph.D., Marihuana Smoking in the United States, 32 Federal Probation 8 (No. 3, 1968), published by the Administrative Office of the United States Courts in Cooperation with the Bureau of Prisons of the Department of Justice, Washington, D. C.; *see also* A. Lindesmith, The Addict and the Law, Indiana University Press (1965), at 222-242.

*The consensus is that cannabis [marijuana] is not a narcotic but rather is a mild hallucinogenic* and that it has a stimulating and depressant effect on the central nervous system. (Emphasis added.)

*Zornes, supra,* 475 P.2d at 114-15.

The plurality states that the evidence in this case shows

"that marijuana has many of the properties of a narcotic, scientifically defined". The manner in which the plurality construes the evidence presented on this issue is untenable. It is conceded that the phenomenon of "tolerance" (over time increasingly larger doses required to achieve the same initial effect) and "physiological dependence" (symptoms of salivation, nausea, convulsions and extreme pain accompany the withdrawal of the drug to the user) and the ability to cause death through respiratory paralysis "are properties of narcotics, scientifically defined, but are not properties of marijuana." The only support that can be found for the position that marijuana has any of the properties of a·narcotic is the contention that it may relieve pain in small doses, produce stupor, and invoke sleep in higher doses as do narcotics. Surely when comparing the properties and characteristics solely attributable to hard narcotics such as heroin, morphine, or cocaine with those jointly held by marijuana and narcotics a distinction becomes apparent between the severity of the respective causal effects. The evidence indicates that the harms produced by the abusive use of marijuana are essentially of the same nature and quality as those produced by the abusive use of alcohol. As such, the failure to include alcohol within the criminally proscribed statutory classification could itself be considered violative of equal protection.

It is evident that much research into the long term effects of consuming marijuana is presently needed. As yet, however, it has not been shown that consumption of marijuana is any more harmful than a comparable consumption of alcohol and it is doubtful that the presently known effects of marijuana are as adverse as those of alcohol. Until legitimate research indicates otherwise, the harm created by placing a criminal sanction on the activity of a significant percentage of our population who would otherwise be law abiding citizens far outweighs any present benefit to be derived from the effects of classifying marijuana as a narcotic. There is no logical or otherwise rational reason for

our society, on the basis of a law that has little or no merit in its application, to continue to make criminals out of and consequently alienate the youth of today.

The use of marijuana does not cause the social ills that the legislature has attempted to guard against. It is the present status of the law classifying marijuana as a narcotic and proscribing its use as a narcotic that is responsible for the social harm created. Organized crime is greatly benefitted by the fact that possessing, using, and trafficking in marijuana have been made illegal. Marijuana's illegality merely adds another weapon to the armory of the underworld for the exploitation of society, just as do prostitution, gambling and other prohibited activity. The difference is that the latter activities are justifiably proscribed while the benefit if any of making marijuana illegal is far outweighed by the consequential social detriment. It is a popular contention that the supplying and marketing of marijuana is done on a low-key individual basis. This position is probably not now applicable to the State of Hawaii. It is contended that the underworld has adopted the practice of controlling the supply of marijuana so that it can withdraw marijuana completely in a given area, simultaneously encouraging the users of marijuana to switch to codeine pills and then to heroin, resulting in a substantial monetary gain for organized crime.[1] While it has been shown that the use of marijuana itself is not addictive and does not necessarily lead to the use of narcotic drugs, the addition of criminal elements bearing pressure on the marijuana user to switch to narcotics creates a substantial danger of increasing the number of narcotic users.

It is suggested that a more reasonable and rational approach in this area would be to regulate marijuana in a manner similar to that of alcohol or tobacco. In this way the abusive use of marijuana, not its reasonable use, would

---

[1]Hunter, Sunday Star-Bulletin & Advertiser, July 25, 1971, § A, at 1. *But see* Honolulu Advertiser, July 26, 1971, § A, at 1.

be given criminal sanctions. Such a change of the law in this area would instill the respect of society that is needed for the preservation of criminal justice and prospectively· decrease the criminalization of our younger generation.